Peter BREYER and Mildred Breyer,
his wife, Plaintiffs,

v.

FIRST NATIONAL MONETARY CORP.,
a Michigan corporation, Defendant.

Civ. A. No. 82–1073.

United States District Court,
D. New Jersey.

Sept. 9, 1982.

Shanley & Fisher, A Professional Corp. by Matthew Farley, Newark, N.J., for plaintiffs.

Robinson, Wayne, Greenberg, Levin, Riccio & La Sala by John B. Livelli, Newark, N.J., for defendant.

Simon, Deitch, Siefman, Tucker & Friedman by Stephen P. Ormond, Southfield, Mich., pro hac vice, for defendant.

## OPINION

ACKERMAN, District Judge.

This case arises out of a dispute over a commodities trading agreement entered into on September 6, 1979 between plaintiffs Peter and Mildred Breyer and defendant First National Monetary Corporation

(FNMC). The case is presently before me on plaintiffs' application for a preliminary injunction enjoining arbitration proceedings commenced by the defendant and plaintiffs' motion for summary judgment on the Third Count of their Amended Complaint. For the reasons set forth below, I will grant plaintiffs' application for a preliminary injunction and deny their motion for summary judgment.

Plaintiffs are a husband and wife residing in New Jersey. Defendant FNMC is a Michigan corporation in the business of trading gold, silver, and other metals pursuant to standardized contracts it terms "leverage" and "cash forward" contracts. Defendant is registered with the Commodity Futures Trading Commission (CFTC) as a Commodity Trading Advisor.[1] It is not a member of an organized commodities exchange, nor are its contracts traded on such an exchange. It markets its standardized contracts directly to the customer.

The Customer Account Agreement executed by the plaintiffs on September 6, 1979 is one of FNMC's "cash forward" contracts. Under the provisions of the contract, the customer makes a deposit, the amount of which is set as a percentage of the purchase price of the particular commodity being purchased.[2] The purchase price is set unilaterally by FNMC. Although full payment is not due until the date of delivery, the customer may be called on to increase the amount of the deposit if the value of the commodity falls before the delivery date. Under the contract, the customer has the choice of taking delivery on or before the transaction, or of converting to an FNMC "leverage account". The contract contains an arbitration clause providing for the arbitration of any disputes arising from the contract.[3]

Between September 1979 and March 1980, FNMC engaged in a number of commodities transactions for plaintiffs' cash forward account. In January 1980, plaintiffs purchased 6,000 ounces of silver for delivery at a later date at $40.95 per ounce. Subsequently, the value of silver dropped. Pursuant to the Agreement defendant issued a call for additional collateral to bring the account up to the required maintenance level. When plaintiffs failed to respond to the call, defendant liquidated their account as authorized by the contract by selling the silver. After the sale, there was a deficit of $61,263.08. On March 15, 1982, to satisfy the deficit, defendant instituted arbitration proceedings against the plaintiffs in Detroit, Michigan.

On April 5, 1982, plaintiffs filed this action alleging that defendant fraudulently induced them to enter the commodities trading agreement by misrepresenting the level of risk involved and that defendant subsequently manipulated plaintiffs' account for its own benefit. Plaintiffs claim that this conduct violated various provisions of the Securities Act of 1933, 15 U.S.C. § 77a et seq., the Securities Exchange Act of 1934, 15 U.S.C. § 78a; the Securities Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5; the Commodity

1. The CFTC is the regulatory body charged with enforcing and implementing the provisions of the Commodity Exchange Act. *See* 7 U.S.C. §§ 2, 4a.

2. The deposit is characterized in the contract as a good faith deposit rather than a down payment. Interest is paid to the customer on this deposit.

3. The arbitration clause reads as follows:
 12.(d) Subject to such legal requirements as may be applicable, any controversy between FNMC and the Undersigned arising out of or relating to this Agreement, or the breach thereof shall be resolved, if either party so requires by arbitration in accordance with the applicable rules of the American Arbitra-

tion Association. The party asserting a claim shall give the other party written notice of any claim which it intends to assert against the other party, including a factual statement of the basis of such claim. In such event, the matter of dispute shall be resolved as follows: Each party shall select one arbitrator and the two so selected shall select a third arbitrator, and, failing a selection of the third arbitrator by the two arbitrators so selected, the third arbitrator shall be selected by the American Arbitration Association, or any successor thereto. Any award resulting from such arbitration shall be final and binding and judgment upon the award may be entered in any court of competent jurisdiction.

Exchange Act, 7 U.S.C. § 1 et seq., and the New Jersey Uniform Securities Law, N.J. S.A. 49:3–46. Plaintiffs also allege various common law claims for fraud, breach of fiduciary duty, breach of contract, and negligence based on diversity jurisdiction.

On May 21, 1982, I signed a Temporary Restraining Order and ordered defendant to show cause why it should not be preliminarily enjoined from proceeding with arbitration pending the outcome of this litigation.[4] The parties submitted briefs and presented oral argument. Because the facts relevant to the injunction were largely undisputed, no witnesses were called to testify. Subsequently plaintiffs filed a motion for summary judgment on the Third Count of their Amended Complaint. I will first consider plaintiffs' application for a preliminary injunction.

■ A preliminary injunction is not granted as a matter of right. *Eli Lilly & Co. v. Premo Pharmaceutical Laboratories, Inc.*, 630 F.2d 120, 136 (3d Cir.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). The decision to grant or deny such relief is left to the sound discretion of the trial court. *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir. 1982). In order to obtain a preliminary injunction, the movant must ordinarily demonstrate both 1) that he will probably succeed in the eventual litigation and 2) that he would suffer imminent and irreparable injury if the relief were not granted. *Kershner, supra,* at 443. These two factors are prerequisites to the granting of a preliminary injunction. *Constructors Ass'n. of Western Pennsylvania v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978).

Where relevant, the court may also consider 3) injury to other parties that might result from the grant or denial of the injunction, and 4) the public interest. *Id.* When the movant has made the requisite showing of irreparable injury and likelihood of success on the merits, the court must balance all four factors in an "attempt to minimize the probable harm to legally protected interests between the time that a motion for a preliminary injunction is filed and the time of the final hearing." *Id.,* at 815.

■■ Where the injunctive relief sought is a stay of arbitration, the inquiry is somewhat different. Because the right to proceed with an arbitration must be based upon agreement of the parties, the court must determine any issues which may preclude arbitration of the underlying dispute. See *H. Prang Trucking Co., Inc. v. Local Union No. 469*, 613 F.2d 1235, 1239 (3d Cir. 1980). The focus is not on whether the movant will ultimately succeed in the underlying dispute, but whether he must pursue that dispute through arbitration.

■ It is uncontested that the Customer Account Agreement which plaintiffs signed contained a clause requiring arbitration of any dispute arising from the contract if either party so desired.[5] Plaintiffs contend, however, that the agreement is a "futures contract" which under the Commodities Exchange Act (CEA) may be legally offered only through an exchange designated by the CFTC as a "contract market". Because defendant's Customer Account Agreement was not offered on such an exchange, they argue, it is illegal and not binding.[6] Plain-

---

**4.** The defendant subsequently consented to refrain from pursuing arbitration until I ruled on plaintiffs' application for the injunction.

**5.** Plaintiffs argue that defendant cannot enforce the arbitration clause because FNMC never executed the contract. The argument is not persuasive. As a general rule, a written contract is enforceable against the party who has signed. *See* 4 Williston on Contracts § 586. The plaintiffs signed the contract, so the arbitration clause is enforceable against them, even without FNMC's signature. Moreover, both parties acted under the terms of the contract as though it were fully executed.

**6.** Plaintiffs had also argued, on their initial petition to the court, that because the account was a discretionary account, it constituted a security. Under *Wilko v. Swan, et al.,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), arbitration clauses are unenforceable where claims arising under the Securities Act of 1933 are involved. Therefore, the arbitration clause in their account, plaintiffs argued, was not enforceable. When I signed the Temporary Restraining Order on May 21, 1982, I rejected this argument. Relying on *Wasnowic v. Chicago Board of Trade,* 352 F.Supp. 1066 (M.D. Pa. 1972), *aff'd.* 491 F.2d 752 (3d Cir. 1973), *cert. denied,* 416 U.S. 994, 94 S.Ct. 2407, 40 L.Ed.2d 773 (1974), I

tiffs further argue that the arbitration clause itself is unenforceable because its format does not conform to the regulations governing arbitration clauses promulgated by the CFTC.

The defendant argues in response that its Customer Account Agreement is not a "futures contract", but a "leverage contract" as defined in § 19 of the CEA, 7 U.S.C. § 23. Leverage contracts, although subject to regulation by the CFTC, are not required to be traded on a designated contract market. Defendant further argues that the CFTC regulations governing arbitration, 17 C.F.R. § 180.1 et seq., by their terms apply only to futures contracts, not leverage contracts.[7]

■ In my judgment, I need not determine at this juncture whether the FNMC Customer Account Agreement is a futures contract or a leverage contract. Regardless of how one characterizes the agreement, I do not believe that the arbitration clause is enforceable under the circumstances in this case.

■ It is well established that federal policy favors arbitration as a means of resolving disputes. *H. Prang Trucking Co., Inc. v. Local Union No. 469, supra,* at 1239. The Federal Arbitration Act, 9 U.S.C. § 1 et seq., implements this policy. Section 2 of the Act provides that a written arbitration clause "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." A judicially created exception to the Arbitration Act has been established, however, in cases involving protective federal legislation. *See, e.g., Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953) (securities); *Applied Digital Technology, Inc. v. Continental Casualty Co.,* 576 F.2d 116 (7th Cir. 1978) (antitrust); *Allegaert v. Perot,* 548 F.2d 432, 437 (2d Cir.) *cert. denied,* 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1084 (1977) (bankruptcy); *Beckman Instruments, Inc. v. Technical Development Corp.,* 433 F.2d 55 (7th Cir. 1970) *cert. denied,* 401 U.S. 976, 91 S.Ct. 1199, 28 L.Ed.2d 326 (1971) (patent); *cf. Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (Title VII claim). Implicit in this line of cases is the principle that the arbitral forum is not adequate to effectuate the policies underlying protective legislation.

■ The protective legislation exception comes into play when there is a conflict between the competing fundamental policies of "federal statutory protection of a large segment of the public, frequently in an inferior bargaining position, and encouragement of arbitration as a 'prompt, economical and adequate solution of controversies.'" *American Safety Equipment Corp. v. J.P. Maguire & Co.,* 391 F.2d 821, 826 (2d Cir. 1968) (quoting *Wilko v. Swan,* 346 U.S. at 438, 74 S.Ct. at 188 (1953)). In order to determine whether such a conflict exists here it is necessary to examine the structure and purpose of the CEA.

---

concluded that defendant's commodities trading account, whether discretionary or not, was not a security. Like the account at issue in *Wasnowic,* the trading account here lacks one of the essential elements of a security, namely common enterprise. While FNMC may have entered trading accounts with many customers, each account is treated separately and each shows profits or losses individually according to the transaction entered. I considered *Wasnowic* dispositive of this issue. This conclusion is confirmed by the recent Third Circuit opinion, *Salcer v. Merrill Lynch, Pierce, Fenner and Smith Inc., et al.,* 682 F.2d 459 (3d Cir. 1982). Citing *Wasnowic,* the Third Circuit stated: "The first question is whether a commodity account is a 'security' within the meaning of federal securities laws. We hold that it is not." *Salcer, supra,* at 462.

7. 17 C.F.R. § 180.1(a) provides

 (a) The term "claim or grievance" as used in this part shall mean any dispute *which arises out of any transaction on or subject to the rules of a contract market,* executed by or effected through a member of that contract market or employee thereof which dispute does not require for adjudication the presence of essential witnesses or third parties over whom the contract market does not have jurisdiction and who are not otherwise available. The term claim or grievance does not include disputes arising from cash market transactions which are not a part of or directly connected with any transaction for the purchase or sale of any commodity for future delivery. (emphasis added).

The CEA[8] is designed to avert the hazards inherent in the volatile sphere of commodities futures trading. Congress has regulated such trading for over 60 years, increasingly strengthening and extending the regulation by amendment. *See generally, Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran et al.,* —— U.S. ——, 102 S.Ct. 1825, 1828, 72 L.Ed.2d 182 (1982). An important component of that protection is a private cause of action which courts have long recognized for claims arising under the CEA. *See Curran, supra,* at ——, 102 S.Ct. at 1836. To supplement this judicial enforcement mechanism, Congress, in the 1974 amendments added two informal remedies for injured parties: (1) a reparations procedure before the CFTC,[9] and (2) in the case of futures contracts, an arbitration procedure to be established by the designated contract markets.[10] *Curran, supra* at ——, 102 S.Ct. at 1836.

The arbitration provision is extremely narrow in scope.[11] It requires each designated contract market to set up an arbitration procedure for the settlement of customers' claims against members of the market or their employees. Use of the procedure must be voluntary,[12] and is limited to claims under $15,000.00. 7 U.S.C. § 7a(11).[13] In addition, it applies only to futures contracts. The fact that this provision was specifically included in the amendment implies that arbitration as a method of resolving CEA disputes was not considered by Congress to be otherwise permissible. Indeed, the arbitration and reparation procedures were described as "new customer protection features." 120 Cong. Rec. 10737 (1974) (remarks of Chairman Poage). Moreover, the limitations imposed on the

---

**8.** The present CEA traces its lineage back to the Future Trading Act, 42 Stat. 187, enacted in 1921 and promptly declared unconstitutional as an improper exercise of the taxing power in *Hill v. Wallace,* 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822 (1922). The regulatory provisions of that Act were subsequently reenacted in the Grain Futures Act, 42 Stat. 998, which was upheld under the commerce clause in *Chicago Bd. of Trade v. Olsen,* 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839 (1923). Thereafter, the statute was amended several times, expanding both its strength and coverage. The present name was bestowed in 1936. Commodity Exchange Act, ch. 545, 49 Stat. 1491. For a full description of the various amendments and their provisions, see the Supreme Court's opinion in *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* —— U.S. ——, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982).

**9.** § 106 of the 1974 amendments, 88 Stat. 1393–1395 (adding § 14 of the CEA, codified as subsequently amended, 7 U.S.C. § 18 (1976 ed. Supp. III)).

**10.** § 209 of the 1974 amendments, 88 Stat. 1401 (adding § 5a(11) of the CEA, codified as subsequently amended, 7 U.S.C. § 7a(11) (1976 ed. Supp. III)).

**11.** The arbitration remedy is prescribed in 7 U.S.C. § 7a(11) which provides:
 Each contract market shall—

 . . . . .

 (11) provide a fair and equitable procedure through arbitration or otherwise (such as by delegation to a registered futures association having rules providing for such procedures) for the settlement of customers' claims and grievances against any member or employee thereof: *Provided,* That (i) the use of such procedure by a customer shall be voluntary, (ii) the procedure shall not be applicable to any claim in excess of $15,000, (iii) the procedure shall not result in any compulsory payment except as agreed upon between the parties, and (iv) the term "customer" as used in this paragraph shall not include a futures commission merchant or a floor broker; . . . .

**12.** In hearings held by the CFTC on proposed regulations to implement this provision there was testimony by commodity futures merchants that potential customers would probably be rejected if they tried to eliminate the printed arbitration clause. *See* Transcript of Commodity Futures Trading Comm'n., Oral Hearing on Arbitration and Other Dispute Settlement Procedures, March 5, 1976, at 85–87. As a result, the CFTC regulations require an arbitration clause to be separately endorsed, and prohibit endorsement of the clause as a prerequisite to becoming a customer. 17 C.F.R. § 180.3.

**13.** In the regulations it promulgated to govern arbitration procedures, the CFTC allowed the contract markets to establish settlement procedures for claims exceeding $15,000, 17 C.F.R. § 180.5, and claims between market members, 17 C.F.R. § 180.6, even though both types of claims were explicitly excluded in 7 U.S.C. § 7a(11). The CFTC justified these regulations as being within their general regulatory power under 7 U.S.C. § 12a(5). The propriety of these regulations is not at issue in this case.

arbitration procedure indicate a reluctance on the part of Congress to authorize arbitration as a general remedy for CEA claims. The short-comings of the arbitral forum compared to a judicial forum have been well recognized.

> [T]he factfinding process in arbitration usually is not the equivalent to judicial factfinding. The record of the arbitration proceedings is not as complete; the usual rules of evidence do not apply; and rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination, and testimony under oath, are often severely limited or unavailable. *See Bernhardt v. Polygraphic Co.,* 350 U.S. 198, 203 [, 76 S.Ct. 273, 276, 100 L.Ed. 199] (1956); *Wilko v. Swan,* 346 U.S. at 435–437 [, 74 S.Ct. at 187–188]. And as this Court has recognized, "[a]rbitrators have no obligation to the court to give their reasons for an award." *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. [593] at 598 [, 80 S.Ct. 1358 at 1361, 4 L.Ed.2d 1424].

*Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 57–58, 94 S.Ct. 1011, 1024, 39 L.Ed.2d 147 (1974). The protections provided in the judicial forum, however, are expensive and this expense can render pursuit of small claims infeasible. Accordingly, Congress limited the arbitration procedure to claims under $15,000, recognizing that there was "an 'economic impediment to Court litigation' only with small claims." *Curran, supra,* at ——, 102 S.Ct. at 1837.[14] As added protection, Congress sought to insure that these claims would be heard by those with some expertise in the commodities field. *See, e.g.,* 40 Fed. Reg. 54430, 54431 (1975). This was accomplished in part by requiring the contract markets to establish arbitra-

tion procedures themselves or to delegate such claims to a registered futures association with established procedures. *See* 7 U.S.C. § 7a(11). The expertise provided in this arbitral forum compensates to some extent for the loss of procedural protections provided by a judicial forum.[15]

▮▮▮ In sum, it is implicit in this statutory scheme that arbitration is generally unsuitable for CEA claims except under the narrow circumstances delineated in 7 U.S.C. § 7a(11). Where a party advances claims which do not come within the scope of § 7a(11), I find that there is a conflict between the policies of the CEA and the Federal Arbitration Act. In the present case, plaintiffs' claims clearly exceed the $15,000 limit. Therefore, whether the agreement is determined to be a futures contract or a leverage contract, it is appropriate to rely on the protective legislation exception to the Federal Arbitration Act and deny enforcement of the arbitration clause. Other courts have come to the same conclusion. *See, Bache Halsey Stuart, Inc. v. French,* 425 F.Supp. 1231 (D.D.C. 1977); *Milani v. Conticommodity Serv., Inc.,* 462 F.Supp. 405 (N.D. Cal. 1976); *Arkoosh v. Dean Witter & Co.,* 415 F.Supp. 535 (D. Neb. 1976), *aff'd. on other grounds,* 571 F.2d 437 (8th Cir. 1978). *Contra Romnes v. Bache & Co., Inc.,* 439 F.Supp. 833 (W.D. Wisc. 1977). Since the arbitration clause is not enforceable, plaintiffs are entitled to an injunction staying the arbitration of their CEA claims. *See H. Prang Trucking, Inc., supra,* at 1239.

▮▮▮ Plaintiffs have asserted common law claims in addition to their CEA claims. It could be argued that their common law claims are subject to arbitration in accordance with the provision in the contract even

---

**14.** Under the House bill, the arbitration procedure was limited to claims not in excess of $5,000. The Committee of Conference substituted the $15,000 limit provided in the Senate amendment. See No. 93–1383, 93d Cong., 2d Sess., reprinted in [1974] U.S. Code Cong. and Admin. News, 5894, 5898.

**15.** The arbitration clause in the Breyer's contract specifies use of the procedures estab-

lished by the American Arbitration Association. Although the American Arbitration Association does try to recommend arbitrators with expertise in the field, there is no assurance of such expertise. *See* Commodity Futures Trading Comm'n., Oral Hearing on Arbitration and Other Settlement Procedures, March 5, 1976, at 137. (Remarks of Gerald Aksen, General Counsel, American Arbitration Association).

if plaintiffs' federal statutory claims are exempted. However, where both nonarbitrable federal claims and common law claims are asserted and the claims are inextricably intertwined, arbitration should not be permitted. *See Miley v. Oppenheimer & Co.,* 637 F.2d 318, 334–37 (5th Cir. 1981); *Mansbach v. Prescott Ball & Turben,* 598 F.2d 1017, 1030–31 (6th Cir. 1979); *De Lancie v. Birr, Wilson & Co.,* 648 F.2d 1255, 1258–59 (9th Cir. 1981) (dicta); *Sibley v. Tandy Corp.,* 543 F.2d 540 (5th Cir. 1976), *cert. denied,* 434 U.S. 824, 98 S.Ct. 71, 54 L.Ed.2d 82 (1977); *Fox v. Merrill Lynch & Co.,* 453 F.Supp. 561, 567 (S.D.N.Y. 1978). *Contra Dickinson v. Heinold Securities, Inc.,* 661 F.2d 638 (7th Cir. 1981). In the present case, plaintiffs' common law and federal claims are, in my judgment, inextricably intertwined.

Plaintiffs' common law and federal claims arise out of the same set of operative facts. Indeed, plaintiffs' common law claims are addressed to the same alleged wrongs: misrepresentation of the risk involved in commodities trading and manipulation of their account.[16] In addition, the contract claim which defendant asserted in the arbitration proceeding is inextricably intertwined with plaintiffs' CEA claims. Defendant claims that the plaintiffs breached the trading agreement. Plaintiffs, however, assert that the trading agreement is in actuality an illegal futures contract. If plaintiffs succeed on that claim, the contract might well be unenforceable against them. In sum, I find that the arbitrable claims cannot be separated from the non-arbitrable CEA claims. Accordingly, I shall stay the arbitration initiated by the defendant in Michigan pending judicial resolution of the non-arbitrable CEA claims.

Plaintiffs have also moved for summary judgment on the Third Count of their amended complaint. This count alleges that defendant's cash forward contract is a futures contract illegally marketed off a licensed exchange in violation of the CEA.[17]

Under Fed. R. Civ. P. 56(c), summary judgment may be granted only if there is no dispute as to a material fact and the moving party is entitled to judgment as a matter of law. In considering such a motion, I must view the evidence in a light most favorable to the party opposing the motion, drawing every reasonable inference in his or her favor. *Small v. Seldows Stationery,* 617 F.2d 992, 994 (3d Cir. 1980).

The sole issue to be determined on this motion is how to characterize the cash forward agreement marketed by the defendant. It is undisputed that the transactions made pursuant to this contract took place off a designated contract market. The plaintiffs contend that defendant's cash forward account is a futures contract which, under the CEA, must be traded on a designated contract market to be legal. Defendant contends that its cash forward is a leverage contract permitted under § 19 of the CEA, 7 U.S.C. § 23. Section 19 contracts are not required to be traded on designated contract markets. A brief description of the two types of contracts may be helpful.[18]

---

**16.** Plaintiff asserts common law claims of fraud, negligence, breach of fiduciary duty and breach of contract.

**17.** Plaintiffs also assert fraud claims in their Third Count, but they are not seeking summary judgment on those claims. Their summary judgment motion is directed solely to the question of the legality of defendant's cash forward contract under the CEA.

**18.** There is a third type of contract mentioned in the CEA, a contract for the sale of a cash commodity for deferred delivery. This type of contract, commonly referred to as a "cash forward" contract, is excluded from CEA regulation under 7 U.S.C. § 2 which provides in perti-

nent part: "future delivery shall not include any sale of any cash commodity for deferred shipment or delivery." Courts have construed this exclusion to apply only to contracts in which the parties actually contemplate physical transfer of the commodity. *See, e.g., Commodity Futures Trading Commission v. Co Petro Marketing Group, Inc.,* 502 F.Supp. 806, 811 (C.D. Cal. 1980), *aff'd,* 680 F.2d 573 (9th Cir. 1982); *In Re Stovall,* [1980] Comm. Fut. L. Rep. (CCH), ¶ 20,941. The accepted explanation is that Congress did not want to subject to burdensome regulations the private contracts of actual users and producers who, for their own

The term "futures contract" is not expressly used in the CEA. What are commonly termed futures contracts are referred to in the CEA as "contracts of sale of a commodity for future delivery." *See, e.g.,* 7 U.S.C. § 2. Among the distinguishing characteristics of a futures contract is its standardized form as to quantity and other terms. The standardization, set by the designated contract market, facilitates trading of the contracts. Although many of the traders never intend to take delivery of the underlying commodity, the contracts provide for uniform delivery points and delivery dates. Trading must take place on a licensed exchange designated by the CFTC as a "contract market" and prices are established by the competitive trading on the exchange.

A § 19 contract is defined as

a standardized contract commonly known to the trade as a margin account, margin contract, leverage account, or leverage contract, or ... any contract, account, arrangement, scheme, or device that the Commission determines serves the same function or functions as such a standardized contract, or is marketed or managed in substantially the same manner as such a standardized contract.

7 U.S.C. § 23(a). In the legislative history of the 1978 amendments to the CEA, leverage transactions were described as follows:

Generally, the leverage contract currently in use is an agreement for the purchase or sale of a contract for the delivery at a later date of a specified commodity in a standard unit and quality, or the close-out of the contract by an offsetting transaction. The principal

characteristics of the contract include: (1) standard units, quality, and terms and conditions; (2) payment and maintenance of "margin"; (3) close-out by an offsetting transaction or by delivery, after payment in full; and (4) no right or interest in a specific lot of the commodity. The leverage dealer is the principal to every transaction and functions as a market maker. The leverage dealer, however, does not guarantee a repurchase market and further reserves the right to cease operating as a market maker or broker for the customer. Most customer commitments are covered or "hedged" in futures, forwards, or physical inventory; most physical inventory, however, is encumbered through bank loans. Leverage contract bid/ask prices are determined by dealer adjustments to spot and futures market quotations.

S. Rep. No. 95–850, 95th Cong., 2d Sess. 26, *reprinted in* [1978] U.S. Code Cong. & Ad. News 2087. These contracts typically involve gold, silver and other precious metals. Congress has explicitly prohibited leverage transactions in agricultural commodities. 7 U.S.C. § 23(a).

 The major difference between a futures contract and a leverage contract appears to be the use of a designated contract market.[19] In a futures contract, the contract market sets the uniform terms of the contracts, while in a leverage transaction, it is the individual merchant who sets the terms. Thus a § 19 leverage transaction looks strikingly like a futures contract traded off a designated contract market. The CFTC has frequently noted the similarity

convenience, had agreed to a deferred shipment. The House Committee Report No. 93–975, accompanying the 1974 legislation, gave as an example a contract between a farmer desiring to sell wheat and a grain elevator operator. In such a situation, a present sale with a provision for delivery at a later date after the wheat has been harvested would not be subject to the regulatory requirements of the CEA. H. Comm. Rep. No. 93–973, 93d Cong., 2d Sess., 129–30 (1974). Defendant does not contend in this litigation that its "cash forward" contract is excluded from CEA regulation under 7 U.S.C. § 2. Rather it contends that its contract is a

leverage contract subject to regulation under § 19 of the CEA, 7 U.S.C. § 23. *See* Affidavit of Michael A. King, filed May 20, 1982.

**19.** Defendant asserts that an important distinction between the two types of contracts is the delivery date. In a futures contract, the delivery date is set by the contract market, in a leverage contract, although there is a final maturity date, the buyer can opt to take delivery earlier. Since traders of either type of contract rarely take delivery, this distinction is, in my judgment, largely cosmetic.

between futures contracts and leverage contracts. *See, e.g.,* 43 Fed. Reg. 56885, 56886 (1978). Even Congress appears uncertain as to whether a leverage transaction is really a different type of contract, or merely a species of futures contracts. Instead of resolving the problem, Congress delegated consideration of it to the CFTC.[20] Congress has given the CFTC the option of creating comprehensive regulations for leverage transactions or of determining them to be futures contracts. 7 U.S.C. § 23(d).[21] As yet, the CFTC has done neither, although the Office of General Counsel to the CFTC has expressed the opinion that certain leverage transactions should be regulated as futures contracts. 44 Fed. Reg. 13494, 13495 (1979).[22] In order to give itself more time to determine which approach to take, the CFTC issued a moratorium in 1978 on any new entrants into the leverage field.[23]

This confusion regarding § 19 leverage contracts complicates the issue before this court. This court must determine whether the FNMC cash forward contract entered into by the Breyers is a § 19 leverage contract legally traded off a designated contract market, or a futures contract illegally traded off a designated contract market. As a threshold matter, resolution of this issue turns on just what a § 19 contract is. Congress, in defining the transactions covered by § 19, relied on trade usage. That is, a § 19 contract is "a standardized contract commonly known in the trade as a . . . leverage account or leverage contract." 7 U.S.C. § 23(a). However, it is unclear from the record before me what is considered a leverage contract by the trade. Neither party has addressed this issue directly. However, defendant appears to rely on the 1976 Report of the Advisory Committee on Market Instruments to the Commodity Futures Trading Commission ("Advisory Report") as the appropriate source of trade usage. The elements identified in the Advisory Report are similar to those cited in the Senate Report. These elements include: 1) a standardized agreement prepared by the seller; 2) an initial down payment, usually a percentage of the purchase price; 3) purchase price determined by the seller; 4) varying terms of contract, some as long as 10 years; 5) interest usually charged on the unpaid balance of the purchase price; 6) requirement of margin maintenance; 7) usually no actual delivery

---

**20.** Congress subjected leverage transactions to regulation for the first time in § 217 of the Commodity Futures Trading Commission Act of 1974. Pub. L. 93–463, 88 Stat. 1389 (1974). Under § 217 of that Act, Congress prohibited such transactions in gold and silver bullion or bulk coins, if the transaction occurred "contrary to any rule, regulation, or order of the Commodity Futures Trading Commission designed to insure the financial solvency of the transaction or prevent manipulation or fraud." Section 217 also gave the CFTC the power to determine that leverage transactions were futures contracts and subject to all the regulations governing futures contracts. In the 1978 legislation, Congress replaced § 217 with § 19. Section 19 prohibited leverage transactions in agricultural commodities, but extended coverage to other commodities in addition to gold and silver, Pub. L. 95–405, 92 Stat. 876.

**21.** Although Congress gave the CFTC broad power under 7 U.S.C. § 23(c) to regulate or ban all leverage transactions or any class of leverage transactions, the language of § 23(d) suggests that Congress envisioned a case by case determination of whether a particular leverage transaction *should be regulated as a futures contract.* However, in the Conference Commit-

tee Report, Congress cautioned that the authority of § 23(d) should not "be casually exercised as a substitute for the regulation of that leverage contract." H.Conf.Rep.No.95–1628, 95th Cong., 2d Sess., 27, reprinted in [1978] U.S. Code Cong. & Ad.News 2087, 2188. Moreover, at that time Congress was aware of the fact that the CFTC was contemplating a blanket ruling classifying all gold and silver leverage contracts as contracts for future delivery. *Id.* at 2189. It is significant that in spite of this awareness, it did not prohibit the CFTC from making such a blanket ruling in the 1978 amendments.

**22.** Congress has prohibited any fraud in connection with leverage transactions. 17 C.F.R. § 31.1.

**23.** Under 17 C.F.R. § 31.1 the moratorium on the offer of leverage transactions in gold or silver applies to any merchant not in business prior to June 1, 1978. Under 17 C.F.R. § 31.2, the moratorium on transactions in other commodities applies to those not in business prior to February 2, 1979.

of the underlying commodity. *Advisory Report,* at 13–16.

 The plaintiffs argue that the defendant's contract does not satisfy this description in several respects. First, they note that the deposit required by the FNMC cash forward contract is a good faith deposit, rather than a down payment on the purchase price. Moreover, instead of being charged interest on the unpaid balance, they were paid interest on their deposit. Finally, they point out that the FNMC cash forwards typically had a term of several months rather than years. In my judgment, viewing the evidence in a light most favorable to the defendant, as I must, these differences are minimal. Regardless of whether the money paid to the seller is a "good faith deposit" or a down payment, it is money paid over to secure the contract.[24] Moreover, FNMC's deposit was required to be maintained at a certain percentage of the purchase price. Thus, if the value of the commodity dropped, FNMC's customer would be called upon to increase its deposit. This requirement is essentially a margin maintenance requirement. Functionally, the only difference between a "good faith" deposit and a "down payment" seems to be who pays interest. On the record before me, this does not appear to be a significant

distinction. The Senate Report definition of a leverage transaction does not even mention interest. Likewise, it does not mention length of the contract as a distinguishing element.[25] Thus, in the absence of some explanation, historical or otherwise, as to why the payment of interest and the length of the contract should distinguish the FNMC cash forward contract from the typical leverage transaction described in the Advisory Report, I find these differences insignificant. Judged in accordance with summary judgment standards, I find that the FNMC cash forward contract could be considered to be a leverage transaction within the scope of § 19 of the CEA, 7 U.S.C. § 23.[26]

Accordingly, plaintiffs are not entitled as a matter of law to summary judgment on the Third Count of their Amended Complaint and I will deny their motion.

In sum, for the reasons just expressed, I have granted the plaintiffs' application for an injunction staying the arbitration proceedings in Michigan. The plaintiffs' motion for summary judgment on the Third Count of their Amended Complaint is denied. The issues of fact and law involved are too complex to be determined on the record presently before the court. An order

24. The Senate Report accompanying the 1978 amendments identified the payment of "margin" as one of the typical characteristics of a leverage transaction. In an unofficial glossary prepared for Congress by the CFTC, "margin" is defined as: "The amount of money or collateral deposited by a client with his broker, or by a broker with the clearinghouse, for the purpose of insuring the broker or clearinghouse against loss on open futures contracts. The margin is not a part payment on a purchase." S. Rep. 98–850, 95th Cong., 2d Sess., 130, reprinted in [1978] U.S. Code Cong. & Ad. News 2087, 2167. FNMC's "good faith" deposit certainly resembles a margin deposit.

25. Several commentators have referred to leverage contracts as long term agreements generally of 5–10 years duration. *See* A. Pierno, *The Leverage Contract Ruling: Is Jonah Really Gone?,* 35 Bus. Lawyer 863 (March 1980); Johnson, *I, Commodities Regulation,* § 1.08, at 23.

26. There is another factor which weighs in favor of denying summary judgment at the present time. The same issue confronting me

is presently under consideration by an administrative law judge in Washington, D.C. The CFTC brought an administrative complaint against FNMC and Monex International, Ltd., charging that both of these companies have been marketing illegal futures contracts with their cash forward contracts. *See In re First National Monetary Corp. and Monex International, Ltd.,* CFTC Docket Nos. 79–56 and 79–57. Counsel for defendant has advised the Court that the administrative hearing was held June 14—July 2, 1982. No decision has yet issued. That determination could well make my task in this case easier. The administrative law judge has both the expertise and the benefit of expert witnesses to assist him in his determination. His ruling could clarify the meaning of § 19 as well as provide guidance on whether FNMC's cash forward comes under § 19. Under such circumstances, it is prudent to deny summary judgment. *Cf. Chicago Mercantile Exchange v. Deaktor,* 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973).

in conformance with this opinion will be submitted by the plaintiffs within ten (10) days of the date of this opinion.