**Sidney H. INGBAR, M.D., Plaintiff, Appellee,**

v.

**DREXEL BURNHAM LAMBERT INCORPORATED, et al., Defendants, Appellants.**

No. 82–1279.

United States Court of Appeals, First Circuit.

Argued June 10, 1982.

Decided July 28, 1982.

Jack R. Pirozzolo, with whom Richard E. Bennett, and Willcox, Pirozzolo & McCarthy, Boston, Mass., were on brief, for defendants, appellants.

Howard M. Miller, with whom Mark S. Furman, and Singer, Stoneman, Kunian & Kurland, P. C., Boston, Mass., were on brief, for plaintiff, appellee.

Before COFFIN, Chief Judge, ROSENN,* Senior Circuit Judge, and BREYER, Circuit Judge.

BREYER, Circuit Judge.

Dr. Sidney Ingbar, the plaintiff/appellee, is a professor at Harvard Medical School. In 1979, he opened an account with the defendant/appellant, a commodities brokerage firm called Drexel Burnham Lambert Incorporated ("Drexel"). When he opened the account, he signed Drexel's two-page form account contract. That form contained a provision stating that Ingbar and Drexel would submit "any controversy" to arbitration (before either the American Arbitration Association or the Board of Arbitration of the New York Stock Exchange). The provision also stated in large bold type:

**WHILE THE COMMODITY FUTURES TRADING COMMISSION (CFTC) RECOGNIZES THE BENEFITS OF SETTLING DISPUTES BY ARBITRATION,**

**IT REQUIRES THAT YOUR CONSENT TO SUCH AN AGREEMENT BE VOLUNTARY. YOU NEED NOT SIGN THIS AGREEMENT TO OPEN AN ACCOUNT WITH DREXEL BURNHAM LAMBERT INCORPORATED.**

Dr. Ingbar placed a separate signature beneath the arbitration clause containing this language.

■ Ingbar and Drexel soon found themselves in a "controversy." Ingbar invested about $40,000 through Drexel; he lost about $24,000; and he believes Drexel is legally liable for the loss. But, instead of seeking arbitration, he sued Drexel in federal district court. Drexel moved for a stay under the Federal Arbitration Act, 9 U.S.C. § 3. The district court denied the stay and Drexel appealed. Although not a "final" order, the denial of Drexel's request for a stay in Ingbar's damage action is properly appealable under 28 U.S.C. § 1292(a)(1). *See Warren Brothers Co. v. Cardi Corp.*, 471 F.2d 1304, 1306 (1st Cir. 1973); *Curran v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 622 F.2d 216, 218 n.1 (6th Cir. 1980), *aff'd on other matters*, —— U.S. ——, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); 9 Moore's Federal Practice ¶ 110.20[4.–1] at 248 (2d ed. 1970). In considering this appeal, we understand the district court's order to comprise only claims under the Commodity Exchange Act, 7 U.S.C. §§ 1—24. So understood, we have examined the relevant statutes and regulations, and have concluded that the arbitration agreement is valid and that the stay should have issued. Accordingly, we reverse.

Section 3 of the Federal Arbitration Act, 9 U.S.C. § 3, requires a district court to "stay the trial of an action" if "the issue involved" is "referable to arbitration" under "an agreement in writing for such arbitration." Ingbar admits that there is an agreement in writing, signed before the dispute arose, for arbitration. He does not admit, however, that the agreement is *valid.* Indeed, he claims that either the Commodity Exchange Act, 7 U.S.C. §§ 1—24, or, alternatively, regulations of the CFTC,

* Of the Third Circuit, sitting by designation.

17 C.F.R. §§ 180.1–180.6, make the agreement in this case invalid and therefore unenforceable. We do not agree.

■ 1. *The statute.* Ingbar's broadest claim is that the statute implicitly forbids all arbitration agreements, entered into before a dispute arises, between commodities brokers and their customers. This claim derives from the Supreme Court's decision in *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), invalidating broker-customer agreements to arbitrate future controversies involving claims under the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* The *Wilko* doctrine has been extended to claims under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq., see, e.g., Weissbuch v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 558 F.2d 831 (7th Cir. 1977); *but cf. Scherk v. Alberto-Culver,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), and, several years ago, by a federal district court in California, to claims involving the Commodity Exchange Act as well. *Milani v. Conticommodity Services, Inc.,* 462 F.Supp. 405 (N.D.Cal.1976). *Cf. Bache Halsey Stuart, Inc. v. French,* 425 F.Supp. 1231, 1233–34 (D.D.C.1977). *But see Romnes v. Bache & Co., Inc.,* 439 F.Supp. 833, 838 (W.D.Wis.1977).

In our view, however, neither *Wilko* nor its progeny implies that the Commodity Exchange Act should now be read to forbid pre-dispute broker-customer arbitration agreements. For one thing, *Wilko* concerned the Securities Act of 1933, 15 U.S.C. § 77a *et seq.,* not the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1—24. And, it turned on the language of specific provisions in the 1933 Act—one conferring on Securities Act plaintiffs "the right to select the judicial forum," 346 U.S. at 427, 74 S.Ct. at 182, *see* 15 U.S.C. § 77v(a); the other making "void" any "condition, stipulation or provision binding any person acquiring any security to waive compliance with any provision" of the Act, 15 U.S.C. § 77n. The Court interpreted this language as showing a congressional intent to bar pre-dispute arbitration agreements. 346 U.S. at 435. The Securities Exchange Act contains at least a similar anti-waiver provision. *See* 15 U.S.C. § 78cc(a). No similar language, however, either as to the selection of forums or the waivability of statutory requirements, appears in the CEA. The only language even arguably relevant in the CEA itself appears in § 5a(11), which states that a "contract market" (*i.e.,* a commodities exchange such as the New York Commodities Exchange, or "Comex," on which Ingbar's futures transactions were carried out):

> shall ... provide a fair and equitable procedure through arbitration or otherwise for the settlement of customers' claims and grievances against any member [of the contract market, such as Drexel] ... [which] procedure shall not be applicable to any claim in excess of $15,000. ...

7 U.S.C. § 7a(11). This provision, however, merely requires "contract markets," such as Comex, to establish arbitration procedures for settling small disputes. It does not preclude claimants from going to court, from invoking CFTC reparations proceedings under 7 U.S.C. § 18, or from using (or agreeing in advance to use) other, "off-market" procedures to settle their disputes if they so choose. Indeed, the CFTC has promulgated regulations that specifically permit the use of pre-dispute arbitration procedures that meet certain conditions. *See* 17 C.F.R. § 180.3, *reprinted in* Appendix to this opinion. (The CFTC once suggested that it might forbid all predispute arbitration agreements, *see* 40 Fed.Reg. 29121, 29122 (July 10, 1975), but did not do so, *see* 41 Fed.Reg. 27526–27 (July 2, 1976); 41 Fed.Reg. 42942–43 (Sept. 29, 1976).) Beyond his attempted analogy to *Wilko,* Ingbar does not claim that these regulations exceed the CFTC's statutory authority.

Moreover, the strict conditions imposed by the CFTC regulations assure that broker-customer arbitration agreements are entered into voluntarily and are fair. The regulations therefore meet the practical concerns as to relative bargaining power and broker overreaching that underlay the decision in *Wilko* (and, for that matter,

*Milani,* which relied on *Wilko*). This much is clearly implicit in the two leading appellate decisions which applied the regulations "retroactively" to invalidate noncomplying broker-customer arbitration agreements. *See Curran v. Merrill Lynch, Pierce, Fenner and Smith, Inc., supra; Ames v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 567 F.2d 1174 (2d Cir. 1977).

Finally, it is significant that *Milani* was decided before the CFTC issued its regulations. It does not mention the regulations. Nor does it even consider differences in the language of the Securities Act and the Commodity Exchange Act. *Compare Romnes v. Bache & Co., Inc., supra. See also Tamari v. Bache & Co. (Lebanon) S.A.L.,* 565 F.2d 1194, 1199 (7th Cir. 1977), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978). In view of these facts, *Milani* to the contrary notwithstanding, we find nothing in the statute to forbid pre-dispute broker-customer arbitration agreements, so long as they comply with the CFTC regulations.

■ *2. The regulations.* Dr. Ingbar next claims that the CFTC regulations forbid arbitration pursuant to "off-market" procedures. That is, he claims that the CFTC regulations forbid arbitration agreements unless they provide for procedures established by, and are made pursuant to, the rules of a "contract market." And he adds, Comex, the relevant "contract market," has not adopted any procedures for arbitrating disputes over $15,000, and has not approved by rule the procedures or forums set forth in his agreement with Drexel. He claims the agreement with Drexel is therefore invalid.

The major premise of this argument, however, is faulty. As Dr. Ingbar correctly observes, one of the CFTC's regulations specifically authorizes contract markets to establish arbitration procedures for claims over $15,000. 17 C.F.R. § 180.5. But, this regulation does not mean that "contract-market" arbitration is the *only* permissible kind of arbitration for such claims. The regulations themselves, in other provisions, plainly contemplate arbitration and dispute settlement procedures *not* established by contract markets. *See* 17 C.F.R. § 180.3(a) (referring to "dispute settlement procedures established by contract markets . . . *or* . . . *arbitration procedures specified in* . . . [a pre-dispute broker-customer] *agreement* . . .) (emphasis added), § 180.3(b)(5) (referring to "a forum for settlement *other than a procedure established pursuant to section 5a(11) of the Act* . . .") (emphasis added). Similarly, CFTC comments throughout the rulemaking process are replete with references to "off-market" arbitration, and statements that such arbitration is permissible so long as it satisfies the requirements in §§ 180.3(b) and 180.5. *See, e.g.,* 41 Fed. Reg. 27527 (July 1, 1976) (carryover paragraph from column 2 to column 3); 41 Fed.Reg. 42945 (subparagraph 2(D)), 42946 ("Amendments to § 180.3(a)") (Sept. 29, 1976). We see no reason to believe that the CFTC meant by § 180.5 to do anything other than enable contract markets to set up dispute resolution procedures for claims above $15,000. Indeed, were that provision, or any other provision in the regulations, meant to preclude "off-market" arbitration, one would by now have expected to see an argument to that effect in the case law. But, as far as we are aware, no such claim has ever been made. *See, e.g., Ames v. Merrill Lynch, Pierce, Fenner and Smith, Inc., supra* (court applies § 180.3 to an agreement providing for "off-market" arbitration).

We also note our doubts about Dr. Ingbar's minor premise, namely his claim that Comex has not authorized the agreement. While Comex Rule 232 states that claims between "member firm[s]" and "non-member[s]" shall be submitted to arbitration under Comex procedures, it adds a proviso: "*provided,* however, that . . . the parties have not specified by lawful contract some other tribunal for arbitration."

*3. The regulations applied.* Finally, Dr. Ingbar argues that the arbitration agreement here at issue does not meet the various specific conditions laid down in 17 C.F.R. § 180.3(b). Three of those conditions are relevant.

First, § 180.3(b)(5) states that if an arbitration agreement provides for a forum "other than" the mandatory small claims forum referred to in the Act, 7 U.S.C. § 7a(11), then the procedures of that forum must comply with the requirements of § 180.5. Section 180.5, in turn, reads as follows:

§ 180.5 *Other customer claims and grievances or disputes.*

A contract market may establish a procedure for settlement of customers' claims and grievances or disputes against any member or employee thereof, which are not covered by §§ 180.1 through 180.4 of this part. The procedure shall be independent of, and shall not interfere with or delay the resolution of, customers' claims or grievances submitted for resolution under the contract market procedure established pursuant to the Act. The procedure must be voluntary, and must be fair and equitable as defined by § 180.2 of this part, except that the aggregate monetary value of the claim or grievance or counterclaim, if any, may exceed $15,000.

Dr. Ingbar—in a reformulated version of his previous argument—claims that § 180.-3(b)(5) means that only a "contract market" can establish arbitration. But, that is not what the regulation says. As read naturally, the "requirements" of § 180.5 are contained in its second and third sentences, not the first sentence. The first sentence (in combination with the third) simply enables a contract market to establish arbitration for claims above $15,000. As read naturally, § 180.3, together with § 180.5, allows a contract market, or individuals, to provide for arbitration in advance, as long as the arbitration agreements are voluntary, fair, equitable, and so forth. We see nothing in the language, or in the purposes of the regulations, for departing (nor have we been shown any reason to depart) from this natural reading of the sections at issue.

■ Second, Dr. Ingbar claims that the arbitration agreement was not "voluntary." *See* 17 C.F.R. §§ 180.3(a) and (b)(1). Specifically, he claims it violates § 180.3(b)(1),

which states that "signing the agreement must not be made a condition for the customer to utilize the services offered by the futures commission merchant" (*i.e.*, Drexel). Dr. Ingbar claims that Drexel's account executive told him he had to sign the contract (which, he says, he "understood" to mean the arbitration clause, as well as the account agreement), in order to open his account. The language, of course, in bold letters and signed by Dr. Ingbar, says the contrary. Dr. Ingbar says he did not read the language, or anything else in the contract. The district court held, however, that without evidence of fraud, Dr. Ingbar was barred by the terms of what he signed. *See McLaughlin v. Maduff & Son, Inc.,* Comm.Fut.L.Rep. (CCH) ¶ 21,217 (C.D.Cal. 1981); *O'Neel v. National Ass'n of Securities Dealers, Inc.,* 667 F.2d 804 (9th Cir. 1982); *Pimpinello v. Swift & Co.,* 253 N.Y. 159, 170 N.E. 530 (1930) (New York law); *Abbasciano v. Home Lines Agency, Inc.,* 144 F.Supp. 235, 236 (D.Mass.1956) (Massachusetts law). And, given Dr. Ingbar's education, the bold type, the language, the separate signature, and the circumstances under which he opened the account and signed the agreement (as revealed in the affidavits), the court found not even "the slightest evidence of fraud." We find no error in the district court's determination.

Finally, language in the district court's opinion suggests that it may have believed the arbitration agreement violated a condition laid down in § 180.3(b)(3). This section states that

the customer must be advised in writing that he or she may seek reparations under section 14 of the Act by an election made within 45 days after the futures commission merchant [*i.e.* Drexel] . . . notifies the customer that arbitration will be demanded under the agreement. This notice must be given at the time when the futures commission merchant . . . notifies the customer of an intention to arbitrate.

*Id.* Although the arbitration clause at issue specifically mentions the right to seek repa-

rations (and describes as well the 45-day election period), Drexel did not notify Ingbar in writing of his right to seek reparations "at the time when [it] . . . notifie[d him] of [its] intention to arbitrate." 17 C.F.R. § 180.3(b)(3).

Drexel argues that this condition is inapplicable because it (Drexel) has not "demanded" arbitration. Rather, it has simply notified Ingbar of its right to have suits settled through arbitration; it has moved for a stay of the court proceedings; and it has announced that it assumes Dr. Ingbar will demand arbitration in an effort to obtain what he believes Drexel owes him.

■ We need not pass on the merits of Drexel's contention, however, for, in any event, we do not believe that § 180.3(b)(3) invalidates the arbitration agreement before us. The obvious purpose of the (b)(3) "notice" requirement is to guarantee that a customer learns about his reparations right in time to invoke it. Given that Dr. Ingbar filed a law suit and made elaborate arguments based upon these regulations, he must have been aware of this right. Indeed, Ingbar does not say he was not aware of this right; he does not now seek, and never has sought, a reparations proceeding; he states in his brief that he did not ask the district court to deny arbitration for this reason; and, finally, he concedes that it would be "inappropriate" to seek affirmance of the district court decision on this ground. Even were the facts otherwise, it is doubtful that we would go beyond the remedy that the regulation would require to make a claimant whole—an extension of the 45-day time limit for electing reparation proceedings. *See Rothberg v. Loeb, Rhoades & Co.*, 445 F.Supp. 1336, 1339 (S.D. N.Y.1978). There is no reason here, however, to impose even that remedy, let alone (for purposes of deterrence, enforcement, or the like) so serious a sanction as invalidation of the arbitration agreement.

For these reasons, the district court's decision is reversed. Its order denying the stay is vacated, and the case is remanded for proceedings consistent with this opinion.

*Reversed and remanded.*

## APPENDIX

### § 180.3 Voluntary procedure and compulsory payments.

(a) The use by customers of the dispute settlement procedures established by contract markets pursuant to the Act or this part or of the arbitration or other dispute settlement procedures specified in an agreement under paragraph (b)(3) of this section shall be voluntary. The procedures so established shall prohibit any agreement or understanding pursuant to which customers of members of the contract market agree to submit claims or grievances for settlement under said procedures prior to the time when the claim or grievance arose, except in accordance with paragraph (b) of this section.

(b) No futures commission merchant, floor broker or associated person shall enter into any agreement or understanding with a customer in which the customer agrees, prior to the time the claim or grievance arises, to submit such claim or grievance to any settlement procedure except as follows:

(1) Signing the agreement must not be made a condition for the customer to utilize the services offered by the futures commission merchant, floor broker or associated person;

(2) If the agreement is contained as a clause or clauses of a broader agreement, the customer must separately endorse the clause or clauses containing the cautionary language and other provisions specified in this section;

(3) The agreement may not require the customer to waive the right to seek reparations under section 14 of the Act and Part 12 of these regulations. Accordingly, the customer must be advised in writing that he or she may seek reparations under section 14 of the Act by an election made within 45 days after the futures commission merchant, floor broker or associated person notifies the customer that arbitration will be

demanded under the agreement. This notice must be given at the time when the futures commission merchant, floor broker or associated person notifies the customer of an intention to arbitrate. The customer must also be advised that if he or she seeks reparations under section 14 of the Act and the Commission declines to institute reparation proceedings, the claim or grievance will be subject to the preexisting arbitration agreement and must also be advised that aspects of the claims or grievances that are not subject to the reparations procedure (i.e. do not constitute a violation of the Act or rules thereunder) may be required to be submitted to the arbitration or other dispute settlement procedure set forth in the preexisting arbitration agreement.

(4) The customer agreement must contain cautionary language, printed in large boldface type, to the following effect:

WHILE THE COMMODITY FUTURES TRADING COMMISSION (CFTC) RECOGNIZES THE BENEFITS OF SETTLING DISPUTES BY ARBITRATION, IT REQUIRES THAT YOUR CONSENT TO SUCH AN AGREEMENT BE VOLUNTARY. YOU NEED NOT SIGN THIS AGREEMENT TO OPEN AN ACCOUNT WITH [name]. See 17 CFR 180.1–180.6.

BY SIGNING THIS AGREEMENT, YOU MAY BE WAIVING YOUR RIGHT TO SUE IN A COURT OF LAW, BUT YOU ARE NOT WAIVING YOUR RIGHT TO ELECT AT A LATER DATE TO PROCEED PURSUANT TO SECTION 14 OF THE COMMODITY EXCHANGE ACT TO SEEK DAMAGES SUSTAINED AS A RESULT OF A VIOLATION OF THE ACT. IN THE EVENT A DISPUTE ARISES, YOU WILL BE NOTIFIED IF [name] INTENDS TO SUBMIT THE DISPUTE TO ARBITRATION. IF YOU BELIEVE A VIOLATION OF THE COMMODITY EXCHANGE ACT IS INVOLVED AND IF YOU PREFER TO REQUEST A SECTION 14 "REPARATIONS" PROCEEDING BEFORE THE CFTC, YOU WILL STILL HAVE 45 DAYS IN WHICH TO MAKE THAT ELECTION.

(5) If the agreement specifies a forum for settlement other than a procedure established pursuant to section 5a(11) of the Act or this part, the procedures of such forum must comply with the requirement of § 180.5.

(c) The procedure established by a contract market pursuant to section 5a(11) of the Act or this part may require parties utilizing such procedure to agree, under applicable state law, submission agreement or otherwise, to be bound by an award rendered in the procedure, provided that the agreement to submit the claim or grievance to the procedure was made in accordance with paragraph (b) of this section or that the agreement to submit the claim or grievance was made after the claim or grievance arose. Any award so rendered shall be enforceable in accordance with applicable law.

(d) The procedure established by a contract market pursuant to the Act or this part shall not establish any unreasonably short limitation period foreclosing submission of customers' claim[s] or grievances or counterclaims (permitted by § 180.4 or this part) by contract market members of employees thereof.

(7 U.S.C. 7a(11), 12a (Supp. V. 1975))

[41 FR 42946, Sept. 29, 1976, as amended at 42 FR 3433, Jan. 18, 1977]

§ 180.5  Other customer claims and grievances or disputes.

A contract market may establish a procedure for settlement of customers' claims and grievances or disputes against any member or employee thereof, which are not covered by §§ 180.1 through 180.4 of this part. The procedure shall be independent of, and shall not interfere with or delay the resolution of, customers' claims or grievances submitted for resolution under the contract market procedure established pursuant to the Act. The procedure must be voluntary, and must be fair and equitable as defined by § 180.2 of this part, except that the aggregate monetary value of the claim or grievance or counterclaim, if any, may exceed $15,000.