**COOK CHOCOLATE COMPANY, A DIVISION OF WORLD'S FINEST CHOCOLATE, INC., Plaintiff,**

v.

**SALOMON INC., Philipp Brothers, Inc., Philipp Brothers Trading Corporation, Philipp Brothers Commodities Corp., Cocoa Merchants, Ltd., Daniel F. Tulig, Mark Glowatz, and Esther Greenfield, Defendants.**

No. 87 Civ. 5705 (RWS).

United States District Court,
S.D. New York.

March 22, 1988.

Cohen & Adolph, New York City (Alan S. Adolph, of counsel), for plaintiff.

Wachtell, Lipton, Rosen & Katz, New York City (Paul Vizcarrondo, Jr., Benjamin E. Rosenberg, of counsel), for defendants Salomon Inc., Philipp Bros., Inc. Philipp Bros. Trading Corp. and Philipp Bros. Commodities Corp.

Abberley Kooiman Marcellino & Clay, New York City (Michael Martell, Esq. of counsel), for defendant Daniel F. Tulig.

Obermaier, Morvillo, Abramowitz & Iason, P.C., New York City (Lawrence Iason, of counsel), for defendant Esther Greenfield.

Lankler, Siffert & Wohl, New York City (Frank H. Wohl, of counsel), for defendant Mark Glowatz.

## OPINION

SWEET, District Judge.

Defendants Salomon, Inc. ("Salomon"), Philipp Brothers, Inc. ("PBI"), Philipp Brothers Trading Corporation ("PBTC") and Philipp Brothers Commodities Corp. ("PBCC") (collectively, "the Phibro defendants") have moved for an order pursuant to sections 2 and 3 of the Federal Arbitration Act, 9 U.S.C. §§ 2, 3 (1982), staying this action in favor of arbitration. Defendants Daniel F. Tulig ("Tulig"), Mark Glowatz ("Glowatz") and Esther Greenfield ("Greenfield") have joined in the motion to stay. Upon the findings and conclusions set forth below, the motion is granted.

*Facts*

Plaintiff Cook Chocolate Company ("Cook") is a division of World's Finest Chocolate, Inc. ("World's Finest"), a Delaware corporation with its principal place of business in Chicago, Illinois. World's Finest manufactures chocolate and confectioneries. Cook purchases the raw materials, such as cocoa and cocoa products, neces-

sary for World's Finest's products. Cook is a member of the New York Coffee, Sugar & Cocoa Exchange ("NYCSE") and until December 31, 1984, was also a member of the Cocoa Merchant's Association of America ("CMAA").

Salomon is a holding company incorporated in Delaware with its principal place of business in New York. PBI, a wholly-owned subsidiary of Salomon, is a commodities trading firm incorporated and having its principal place of business in New York. PBI is a member of the CMAA. PBTC, a wholly-owned subsidiary of PBI, is a Delaware corporation with its principal place of business in New York. Among other things, PBTC buys and sells cocoa futures contracts on the NYCSCE, of which it is a member. PBCC, also a wholly-owned subsidiary of PBI, is incorporated and has its principal place of business in New York. PBCC is a licensed Futures Commission Merchant and trades cocoa futures for the accounts of others on the NYCSCE, of which it also is a member.

The CMAA is a trade organization of cocoa merchants. Article XII of the CMAA bylaws states that all contracts between members covering cocoa beans or cocoa products are subject to arbitration unless the contract specifically disavows arbitration. Article XII states, in relevant part:

> Unless the contract by its terms specifically negates its inclusion, all contracts covering cocoa beans or cocoa products between members shall include or be deemed to include the following clause:
>> Any question, controversy, claim or dispute whatever arising out of or under this contract, not adjusted by mutual agreement, shall be settled by arbitration in the City of New York, State of New York, under and in accordance with the rules of The Cocoa Merchants' Association of America, Inc. and judgment upon the award rendered may be entered in any competent court in the State of New York in accordance with the provisions of the laws of the State of New York.

The CMAA bylaws also specify the rules and procedures for the arbitration.

The CMAA promulgates standard form contracts that cocoa merchants may use or incorporate by reference in whole or in part. The CMAA standard form contract that is applicable to cocoa sales, Standard Contract 1–A, contains detailed terms and provisions relevant to the purchase, sale and delivery of cocoa beans. Standard Contract 1–A contains an arbitration provision, as follows:

> Any dispute under this contract shall be settled by arbitration in accordance with the rules of the Cocoa Merchants' Association of America, Inc., whose award shall be final and binding upon buyer and seller, and judgment upon the award may be entered in any court having competent jurisdiction.

The NYCSCE is a contract market registered with the Commodities Futures Trading Commission ("CFTC") for the trading of cocoa and cocoa futures. It is the only contract market in the country for the trading of cocoa and cocoa futures.

NYCSCE Rule 6.02(b) provides for mandatory arbitration of any "claim or grievance" among members of the NYCSCE so long as either party elects to compel arbitration. The rule reads, in relevant part, as follows:

> Any claim or grievance by a member of the NYCSCE against another member, whether originating before or during the membership of the parties, shall be settled by arbitration in accordance with these Arbitration Rules, if any such member so elects.

"Claim or grievance" is defined in NYCSCE Rule 6101(a) to mean "any dispute which arises out of any transaction on or subject to the rules of this Exchange, executed by or effected through a member of this Exchange...." NYCSCE Rule 6.02(a) provides for voluntary arbitration between a member of the NYCSCE and a customer. "Customer" is defined in NYCSCE Rule 6.01(b) to mean "any person with a claim or grievance against a member of this Exchange or any employee of such member; provided, however, that it

shall not include members of this Exchange."

In June 1981, Cook entered into the first in a series of 43 standard form contracts with PBI for the sale by PBI to Cook of cocoa beans and cake. Each of the contracts was a single-page typewritten document that specified the quantity and type of cocoa bean or cake PBI would sell to Cook, the terms and dates of the shipment, and the date of delivery. Under each contract, the price that Cook would pay PBI would be fixed by reference to the price of specified cocoa futures. Finally, each of the contracts stated: "All relevant terms and conditions of the Cocoa Merchants' Association of America, Inc. contract to apply." None of the contracts disavowed the CMAA arbitration clause contained in the CMAA bylaws.

### The Complaint

Cook filed the complaint in this action on August 3, 1987. The complaint challenges a practice that Cook claims threatens the integrity of the NYCSCE. The underlying contracts between Cook and PBI provided that the prices for Cook's purchases of cocoa products ("cocoa physicals") would be determined by Cook's purchase through PBI and PBTC of specified cocoa futures contracts. The complaint charges that the defendants, acting in concert, devised a scheme to defraud Cook in the course of its purchase of cocoa physicals and futures. In particular, the complaint alleges that the defendants falsely told Cook that they would execute futures contracts for the purpose of fixing the price for the cocoa physicals in a manner that was more advantageous to Cook than its prior transactions through independent brokers on the floor of the NYCSCE. Through the alleged scheme, Cook contends, the defendants falsely reported to Cook higher buy prices and lower sell prices than Cook would have obtained had such trades been executed on the NYCSCE floor. Thus, the complaint alleges violations of the Commodity Exchange Act ("CEA") and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and a number of common law offenses. The RICO count is premised on alleged violations of the mail

and wire fraud statutes and Cook's characterization of the allegedly fraudulent scheme as an ongoing pattern of racketeering activity.

On September 30, 1987, the Phibro defendants filed the instant motion to stay this action in favor of arbitration. Following the submission of briefs and affidavits, oral argument was held on the instant motion on December 18, 1987.

### The Federal Arbitration Act

Section 2 of the Federal Arbitration Act (the "Act"), 9 U.S.C. § 2 (1982), states that:

> A written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable save upon such grounds as exist at law or in equity for the revocation of any contract.

Section 3 of the Act, 9 U.S.C. § 3 (1982), provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending ... shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement....

These sections of the Act represent a strong federal policy in favor of arbitration. The Supreme Court has repeatedly recognized and reaffirmed that policy, most recently in *Shearson/American Express, Inc. v. McMahon*, —— U.S. ——, ——, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987):

> The Arbitration Act thus establishes a "federal policy favoring arbitration," *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983), requiring that "we rigorously enforce agreements to arbitrate." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. [213] at 221, 105 S.Ct. [1238] at 1243 [84 L.Ed.2d 158 (1985) ].

*See also Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 625–26, 105 S.Ct. 3346, 3353–54, 87 L.Ed.2d 444 (1985); *Southland Corp. v. Keating,* 465 U.S. 1, 10, 104 S.Ct. 852, 858, 79 L.Ed. 2d 1 (1984). The Court of Appeals for this Circuit has also emphasized repeatedly the strength of the preference for arbitration. *See, e.g., Rush v. Oppenheimer & Co.,* 779 F.2d 885, 887 (2d Cir.1985); *Prudential Lines, Inc. v. Exxon Corp.,* 704 F.2d 59, 63 (2d Cir.1983).

The Phibro defendants urge this court to give effect to the federal policy favoring arbitration and grant their application for a stay pending arbitration for three reasons. First, they contend that because the 43 contracts between PBI and Cook all incorporated by reference the CMAA standard form contract, which has an unambiguous and comprehensive arbitration clause, the parties are bound by that arbitration clause. Second, PBI and World's Finest were at all times during the period from June 5, 1981 (when PBI and Cook signed their first contract) through December 5, 1984 (when they signed their final contract), members of the CMAA, the bylaws of which state that all contracts between members incorporate by reference an arbitration provision contained in the CMAA bylaws unless the contract has an express statement to the contrary. Because the contracts between PBI and Cook did not disavow the CMAA bylaws' arbitration provision, and therefore incorporated it by reference, the Phibro defendants contend that arbitration provision binds the parties. Third, World's Finest, PBTC and PBCC are and were members of the NYCSCE, the rules of which require arbitration for disputes between members related to cocoa transactions. The Phibro defendants argue that these rules are binding and also require that the parties arbitrate.

*The Agreements to Arbitrate*

■ On a motion to stay a proceeding in favor of arbitration, the court has a limited and well-defined task. It must determine first whether an agreement to arbitrate exists, *see* 9 U.S.C. § 4 (1982); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403–04, 87 S.Ct. 1801, 1805–

06, 18 L.Ed.2d 1270 (1967), and second, whether the dispute between the parties falls within the scope of the matters they agreed to arbitrate, *see Prudential Lines, Inc. v. Exxon Corp.,* 704 F.2d at 63. The parties disagree as to the source of the legal principles that guide the court's consideration of these two issues. On the one hand, the Phibro defendants contend that federal law governs as to both the making and the scope and enforceability of the agreement to arbitrate. On the other hand, while conceding that federal law governs the interpretation and enforceability of an agreement to arbitrate, Cook argues that whether the parties entered into an agreement to arbitrate remains an issue of state law.

The parties' confusion is understandable, for courts themselves have disagreed as to the applicable legal principles. *Compare Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 845 (2d Cir.1987) ("national substantive law" governs validity and enforceability of arbitration agreements) *and In the Matter of Hart Ski Mfg. Co.,* 711 F.2d 845, 846 (8th Cir.1983) ("federal law governs the question of whether the parties have agreed to arbitrate") *with Supak & Sons Mfg. Co. v. Pervel Indus., Inc.,* 593 F.2d 135, 137 (4th Cir.1979) (federal law "dictates the effect of contractually agreed upon arbitration provision, but it does not displace state law on the general principles governing the formation of the contract itself").

In recent decisions, *see Rush v. Oppenheimer,* 681 F.Supp. 1045 (S.D.N.Y.1988); *Graniteville Co. v. Star Knits of California, Inc.,* 680 F.Supp. 587 (S.D.N.Y.1988), this court has adopted the Honorable Morris E. Lasker's careful exegesis in *Duplan Corp. v. W.B. Davis Hosiery Mills, Inc.,* 442 F.Supp. 86 (S.D.N.Y.1977), of the legal principles that govern a court's consideration of an agreement to arbitrate:

> Congress intended only to place arbitration agreements affecting commerce ... on the same footing as other contracts, but not to create a federal law of contract formation. (citations omitted). It is the "scope" rather than the existence

of the agreement which is determined by reference to a body of federal law. (citations omitted). The question whether a valid arbitration clause exists involves general contract principles; state law governs the disposition of that question. *Duplan Corp.*, 442 F.Supp. at 87–88.

■ In *Perry v. Thomas*, — U.S. —, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987), the Supreme Court recently addressed the nettlesome problem of which law governs what aspect of agreements to arbitrate. Adhering closely to Judge Lasker's approach, the Court said:

> An agreement to arbitrate is valid, irrevocable, and enforceable, *as a matter of federal law*, see *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983), "save upon such grounds as exist at law or in equity for the revocation of *any* contract." 9 U.S.C. § 2 (emphasis added). Thus state law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. A state law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with this requirement of § 2. See *Prima Paint, supra*, 388 U.S., at 404, 87 S.Ct., at 1806; *Southland Corp. v. Keating*, 465 U.S. at 16–17, n. 11, 104 S.Ct., at 858. A court may not, then, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law.

*Perry v. Thomas*, 107 S.Ct. at 2527 n. 9. Thus, § 2 of the Act preempts state statutory and case law that treats arbitration agreements differently from any other contract. At the same time, however, § 2 of the Act preserves general principles of state contract law as rules of decision on whether the parties have entered into an agreement to arbitrate. Once an agreement to arbitrate is found to exist, federal substantive law as set forth in the Act and federal court decisions governs the scope and interpretation of the agreement.

■ Under the incorporation doctrine in contract law, where a contract expressly refers to another document, "that other document, or so much of it as is referred to, is to be interpreted as part of the contract." *Williston on Contracts*, § 628 at 901 (Jaeger ed. 1961); *see Matter of Level Export Corp.*, 305 N.Y. 82, 87, 111 N.E.2d 218 (1953). New York law applies the incorporation doctrine more strictly to arbitration agreements than nonarbitration agreements and requires a specific reference to arbitration within the body of the principal agreement. See *Riverdale Fabrics Corp. v. Tillinghast–Stiles Co.*, 306 N.Y. 288, 188 N.E.2d 104 (1954). *Perry*, however, precludes application of the New York rule. Thus, the issue for the court is whether the parties intended to incorporate material extrinsic to the contract as part of its terms.

■ Turning to the instant case, each of the 43 contracts between Cook and PBI stated: "All relevant terms and conditions of the Cocoa Merchants' Association of America, Inc. contract to apply." These letter agreements describe the product and set the quantity, price and terms of shipment and payment. Below each contract's recital of these terms and just above the signature lines for buyer (Cook) and seller (PBI) is the statement providing that all relevant terms and conditions of the CMAA contract would apply. Standard Contract 1–A is a nine-page document that establishes standard terms for the type of transactions that took place between Cook and PBI, that is, the purchase and sale of physical cocoa products. Thus, it appears beyond dispute that the parties intended Standard Contract 1–A to supply the numerous substantive provisions that would apply to all of the transactions between the parties and the letter agreements to supply such variable terms as product, quantity and price for each separate transaction.

Cook contends, however, that by using the word "relevant" to qualify the incorporation of the terms of Standard Contract 1–A, PBI created an ambiguity as to which

terms are incorporated into the letter agreements and which are not. This ambiguity, Cook argues, must be construed against PBI, as drafter of the document, to bar the inclusion of the arbitration provision contained in Standard Contract 1–A. However, Cook's experience as a sophisticated purchaser of cocoa products and a member of both the CMAA and the NYCSCE belies its claimed uncertainty as to the relevance of an arbitration clause to the cocoa transactions between it and PBI.

As a member of the CMAA and an experienced purchaser of cocoa products, Cook has not claimed that it was unaware that each of the CMAA's standard form contracts contains an arbitration provision. Similarly, Cook has not contended that it was unaware of the provision in the CMAA's bylaws which provides that "all contracts covering cocoa beans or cocoa products between members shall include or shall be deemed to include" an arbitration clause unless "the contract by its terms specifically negates its inclusion." Cook is also a member of the NYCSCE whose rules also provide for arbitration of disputes between members.[1] In other words, at the time of the transactions at issue here, both the trade association and the commodities exchange to which Cook belonged had established arbitration as the preferred forum for the resolution of disputes among members. Thus, it was well within Cook's expectations that any disputes that might arise between it and PBI would be subject to arbitration and that the terms of arbitration would be set by the arbitration clause contained in Standard Contract 1–A.

Certain characteristics of the cocoa deals between Cook and PBI may have made certain terms and conditions of Standard Contract 1–A irrelevant. However, the selection of arbitration as the forum of choice for both the CMAA and the NYCSCE firmly establishes its importance in matters of trade between members. The relevance of a dispute resolution provision is not a factor that would vary with the terms of the particular transaction. Indeed, the importance of arbitration is underscored by the CMAA bylaws which, as discussed above, deem an arbitration clause included in contracts between members absent an express statement to the contrary. None of the 43 contracts between Cook and PBI expressly disavowed arbitration. Thus, there can be no dispute that the arbitration clause in Standard Contract 1–A was a "relevant term" intended by the parties to be a part of their letter agreements. On these facts and under general principles of contract formation, therefore, the parties validly incorporated the arbitration clause in Standard Contract 1–A into each of their 43 separate contracts for the purchase and sale of cocoa products.

■ Having found that a valid arbitration agreement exists, the sole remaining issue is whether Cook's claims fall within the scope of that agreement. A dispute is arbitrable pursuant to an arbitration provision in a contract between the parties to the dispute if (1) the parties' arbitration agreement encompasses it, and (2) no public policy demands that the dispute be resolved in a public forum. *Mitsubishi Motors Corp.*, 473 U.S. at 628, 105 S.Ct. at 3355. Whether an arbitration provision in a contract encompasses a particular dispute is a question of contract interpretation, *id.* at 626, 105 S.Ct. at 3354, but the strong federal policy favoring arbitration requires that any ambiguities in the interpretation of a contractual arbitration provision be resolved in favor of arbitration. *See id.* at 626, 105 S.Ct. at 3354 ("as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability"); *Moses H. Cone Memorial Hospital*, 460 U.S. at 24, 103 S.Ct. at 941 ("the question of arbitrabil-

---

**1.** Cook contends that with respect to the cocoa futures transactions that form the basis of its complaint against the Phibro defendants it was a customer of PBI and that, therefore, NYCSCE Rule 6.02(b), which makes arbitration of disputes between members mandatory, is not applicable. As discussed above, the definition of "customer" in NYCSCE Rule 6.01(b) expressly excludes members of the NYCSCE. Thus, the NYCSCE has decided that even when one member has been a customer of another in a particular transaction, any disputes between them must be referred to arbitration.

ity must be addressed with a healthy regard for the federal policy favoring arbitration"); *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 63 (2d Cir.1983) ("doubts about arbitrability should be resolved in favor of arbitration").

■ As discussed above, Cook has asserted claims based on the Phibro defendants' allegedly fraudulent handling of cocoa futures transactions, which, Cook contends, took place entirely outside the framework of the physical contracts. Thus, Cook argues that its complaint against the Phibro defendants is not related to and does not arise from their contractual relationship as set forth in the letter agreements. For the same reason, Cook asserts that Standard Contract 1–A, including its arbitration clause, is not relevant to the instant dispute. The record, however, contains little to support Cook's contentions.

The entire course of dealing between Cook and the Phibro defendants was pursuant to contract. All of the physical transactions, shipments and deliveries were as specified in the 43 contracts. Each of the 43 contracts stated that the price of the physical cocoa would be determined by reference to specified futures transactions, and it is the Phibro defendants' handling of that part of the physical contracts that is the basis of Cook's claims. Contrary to Cook's assertions, the contracts of which Standard Contract 1–A's arbitration clause has been found to be a part impose the duties out of which its dispute with the defendants arises. The arbitration provision is plain on its face: it expressly covers "any dispute under the contract." There were no extra-contractual relations between the parties, and, therefore, all disputes between the parties arise under the contract and are arbitrable.

■ Finally, there is no public policy against arbitration of Cook's common law, RICO and CEA claims, and Cook does not dispute that all of its claims are arbitrable. Plaintiff's Memorandum of Law at 23. Nonetheless, Cook urges the court to adopt the "distinctly isolated view" that the Act does not apply to claims alleging violations of the CEA. *See, e.g., Breyer v. First National Monetary Corp.*, 548 F.Supp. 955, 960 (D.N.J.1982); *Bache Halsey Stuart, Inc. v. French*, 425 F.Supp. 1231, 1233–34 (D.D.C.1977); *Milani v. Conticommodity Services, Inc.*, 462 F.Supp. 405, 407 (N.D.Cal.1976). The majority view, however, is that fraud claims under the CEA are arbitrable. *See, e.g., Smoky Greenhaw Cotton Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 720 F.2d 1446, 1449–50 (5th Cir.1983); *Ingbar v. Drexel Burnham Lambert, Inc.*, 683 F.2d 603, 605–06 (1st Cir.1982); *Salcer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 682 F.2d 459, 460 (3d Cir.1982); *Tamari v. Bache & Co.*, 565 F.2d 1194, 1199–1200 (7th Cir.1977), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978).

The majority view that CEA claims are arbitrable is consistent with the views expressed by the Supreme Court in *Shearson/American Express v. McMahon*, —— U.S. ——, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), where the Court held that claims under both RICO and § 10(b) of the Securities Exchange Act of 1934 are arbitrable. Moreover, the CEA has, since the passage of the Futures Trading Act of 1982, contained a provision expressly acknowledging the appropriateness of resolving commodities disputes by arbitration. *See* 7 U.S.C. § 25(a)(2) (1982) ("Nothing in this subsection shall limit or abridge the rights of the parties to agree in advance of a dispute upon any forum for resolving claims under this section, including arbitration."). This provision was included so that aggrieved commodities customers "would be encouraged to arbitrate their claims instead of petitioning for reparative hearings." H.Rep. No. 97–565(I) at 56 (97th Cong., 2d Sess.1982) *reprinted in* [1982] U.S.Code Cong. & Ad.News at pp. 3871, 3905. In view of the overwhelming support among the circuits for the arbitrability of CEA claims and the federal policy in favor of arbitration, Cook's claims under the CEA are arbitrable.

Upon the findings and conclusions set forth above, the Phibro defendants' motion to compel arbitration is granted. As indi-

cated during oral argument on this motion, insofar as no cross-claims have been asserted by any party, defendant Tulig's motion to stay such prospective cross-claims pending arbitration is premature and is, therefore, denied without prejudice to renew.

Judgment will be entered dismissing the complaint with leave to reopen *ab initio* upon motion and without payment of filing fees, with the specific understanding that the court retains jurisdiction for any further action necessary in the matter.

IT IS SO ORDERED.