**FIRST NATIONAL MONETARY CORPORATION, Petitioner,**

**v.**

**COMMODITY FUTURES TRADING COMMISSION, Respondent.**

**No. 87–3549.**

United States Court of Appeals, Sixth Circuit.

Aug. 10, 1988.

Donald F. Tucker, Stephen P. Ormond, Paul S. Magy, Simon, Deitch, Tucker & Friedman, Southfield, Mich., for petitioner.

Marshall E. Hanbury, Whitney Adams, Mary C. Albert, Commodity Futures Trading Com'n, Washington, D.C., Jay L. Witkin, for respondent.

Before MILBURN and BOGGS, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

PER CURIAM.

First National Monetary Corporation ("FNMC") petitions for review of a Commodity Futures Trading Commission order dismissing its application for review of an Administrative Law Judge's decision denying legal fees under the Equal Access to Justice Act ("EAJA"), 5 U.S.C. § 504. For the reasons discussed below, we affirm the Commission's order.

I

FNMC is a corporation engaged in the trading of gold, silver and other precious commodities pursuant to standardized contracts known as "cash forward" contracts. In August 1979, the Commodity Futures Trading Commission's Division of Enforcement ("the Division") commenced an en-

forcement action against FNMC, charging that the "cash forward" contracts were illegal futures contracts under the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, because they were not executed or consummated by or through a member of a designated contract market. 7 U.S.C. § 6h. The Division, in a previous appeal to this court raising administrative issues not pertinent here, indicated that if FNMC could show that its "cash forward" contracts constituted off-exchange leverage contracts within the meaning of section 19 of the CEA, 7 U.S.C. § 23, then FNMC will have established a successful defense to the Division's enforcement action. *First Nat'l Monetary Corp. v. Commodity Futures Trading Comm'n*, 677 F.2d 522 (6th Cir.), *cert. denied sub nom. Monex International Ltd. v. Commodity Futures Trading Commission*, 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 509 (1982). "The question whether the ... 'cash forward' contracts offered by [FNMC] are leverage contracts [was] an issue to be resolved in the administrative adjudicatory proceeding." *Id.* at 528 (Order of Clarification).

The case was tried before an Administrative Law Judge. The Division's sole witness testified that FNMC's "cash forward" contracts were contracts for the sale of commodities for future delivery. FNMC presented several witnesses who opined that its "cash forward" contracts were of the type commonly known to the trade as leverage contracts within the meaning of the CEA.

On April 29, 1983, the ALJ ruled that FNMC had not persuasively shown that its "cash forward" contracts were commonly known to the trade as leverage contracts. The ALJ rejected the testimony of FNMC's witnesses on two grounds. Several witnesses were not credible because they had a vested interest in the outcome of the proceedings. Others were found unpersuasive because they were not affiliated with a leverage merchant at the time they testified, or had never been affiliated with a leverage merchant and gained familiarity with the contracts at issue only as part of the litigation. The ALJ further concluded that the "cash forward" contracts were futures contracts being sold in violation of the CEA.

FNMC appealed to the Commission, which reversed. The Commission found unpersuasive the ALJ's reasons for discrediting the testimony of all the leverage witnesses. Although the Commission agreed that there were grounds for "according less-than-full weight" to the testimony of certain leverage witnesses, and arguably for "disregarding" the testimony of other leverage witnesses, it determined that there was a "significant residue of record evidence that was not effectively rebutted—at least on this record—and which establishe[d] the 'leverage defense.'" The Commission dismissed the administrative complaint.

However, the Commission indicated that, were it not for the state of the record with respect to the "leverage defense," it would affirm the ALJ's determination that FNMC's "cash forward" contracts were futures contracts being illegally sold outside a designated contract market. In reaching this conclusion, the Commission focused on the instrument as a whole and attempted to discern its underlying purpose. The Commission found that FNMC's "cash forward" contracts served substantially the same function as exchange traded futures contracts: they "provid[ed] participants with an opportunity to assume or shift the risk of price changes in an underlying commodity without the forced burden of [actual] delivery."

The Commission also found that the "cash forward" contracts had many of the same characteristics as futures contracts. The contracts were "standardized as to such terms as initial margin payments, method of delivery, and the date by which customers were required to give notice of intent to make or take delivery." The price for the "cash forward" contracts was agreed upon at the time the contracts were made, with FNMC unilaterally setting the bid and asking prices for the contracts. The contracts also provided the opportunity to forego delivery "by means of offset or rollover (*i.e.*, simultaneously entering an offsetting transaction or acquiring the

same position in a forward contract with a more distant delivery month)." Finally, the contracts "require[d] initial margin payments that [were] a fixed percentage of the contract price, as well as the payment of additional maintenance margin if the value of the underlying commodity move[d] against the customer's position."

The Commission rejected FNMC's contention that the "cash forward" contracts lacked certain features that were characteristic of futures contracts, such as exchange-standardized terms and "auction-type outcry pricing." The Commission stated that, "just as an instrument need not be traded on a designated exchange to constitute a futures contract, those characteristics that necessarily flow from the fact that an instrument is executed off-exchange are equally irrelevant to the issue of whether that instrument constitutes a futures contract." The Commission concluded,

> [W]e believe that when the overall effect and operation of [FNMC's] forwards is considered, they readily can be seen to constitute what one of [FNMC's] own economists characterized as the "retail equivalent" of exchange-traded futures contracts. Thus, were it not for the particular circumstances of this case, we would affirm the ALJ's determination that [FNMC's] forwards constituted illegal off-exchange futures contracts. Given the particular circumstances of this case and the state of the record evidence with respect to the "leverage defense," however, we reverse the initial decision and dismiss the complaints.

On October 15, 1985, FNMC applied for an award of some $566,000 in legal fees, costs and other expenses under the EAJA and the Commission's implementing regulations. 17 C.F.R. Part 148. FNMC claimed that the Division lacked substantial justification for filing the enforcement action and for continuing the adjudication after the Division stipulated that the "leverage defense," if proven, would be dispositive. The ALJ denied the application, concluding merely that the Division was "substantially justified" in bringing the adjudicatory action against FNMC.

FNMC had until December 31, 1985, to file an application for review of the ALJ decision. On December 20, FNMC mailed to the Commission a one-page application for review, stating that FNMC was seeking review of the ALJ's decision that the Division "was substantially justified in bringing the action and that FNMC is not entitled, for that reason or otherwise, to an award of fees, costs and other expenses under the Equal Access to Justice Act, 5 U.S.C. § 504." FNMC offered "to file such briefs and address such issues as the Commission may direct."

The Commission did not receive the application for review until January 3, 1986, two days after the filing deadline had passed. Almost one year later (November 6, 1986), the Commission sent FNMC an order to show cause why the application should not be dismissed or denied as untimely and unspecific. The order stated that "FNMC's response to this show cause order may contain whatever the company's arguments may be regarding [the Commission's] exercise of discretionary jurisdiction to review the ALJ's substantial justification holding."

After receipt of the parties' submissions, the Commission dismissed FNMC's application. The Commission concluded that the application for review was untimely and failed to set forth any reason for the Commission to exercise its discretionary review. Notwithstanding these flaws, the Commission ruled that FNMC's challenge to the ALJ's finding of "substantial justification" was without merit. The Commission went further than the ALJ, concluding that the Division was substantially justified both in bringing the enforcement action and in maintaining it after the Division stipulated that the "leverage defense," if proven, would be dispositive.

On June 16, 1987, FNMC petitioned this court for review of the Commission's order. On July 28, the Commission reopened the proceedings, apparently without notifying FNMC, to reconsider its previous decision in light of *Riddle v. Secretary of Health & Human Services*, 817 F.2d 1238 (6th Cir.

1987),[1] which was decided on May 1, 1987. The Commission reaffirmed its previous ruling that the application for review was untimely, rejected a finding of excusable neglect, and concluded as before that the Division's position was substantially justified.

After carefully reviewing the parties' submissions and the record, we rule that the Division's position was "substantially justified" and, therefore, affirm the Commission's order denying FNMC's claim for legal fees, costs and other expenses under the EAJA. Because the Commission addressed the merits of the EAJA claim, we will proceed directly to that issue.

## II

The EAJA entitles a prevailing party to receive reasonable fees and other expenses incurred in an adversary adjudication, unless "the position of the agency was substantially justified or that special circumstances make an award unjust." 5 U.S.C. § 504(a)(1). The "position of the agency" refers to the agency's litigating position and "the action or failure to act by the agency upon which the adverse adjudication is based...." *Id.* at § 504(b)(1)(E). Since there is no contention that special circumstances would render an EAJA fee award unjust, the sole question raised is whether the Division's position was substantially justified. The Division's position will be substantially justified if it is "justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood,* —— U.S. ——, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988). This standard is no different than the "reasonable basis in law and fact" formulation that this court adopted in *Trident Marine Construction, Inc. v. District Engineer,* 766 F.2d 974, 980 (6th Cir.1985). *Underwood,* 108 S.Ct. at 2550. However, it is contrary to the stricter standard adopted by a panel of this court in *Riddle v. Secretary of Health & Human Services,* 817 F.2d 1238 (6th Cir.1987), which has

been vacated and is awaiting rehearing *en banc.* 823 F.2d 164 (6th Cir.1987).

In reviewing the Commission's order, we must determine whether "the failure to make an award of fees and other expenses ... was unsupported by substantial evidence." *Id.* at § 504(c)(2). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). "Even if the court might arrive at a different conclusion, the decision must be affirmed if supported by substantial evidence." *Siterlet v. Secretary of Health & Human Services,* 823 F.2d 918, 920 (6th Cir.1987) (per curiam) (citation omitted). We conclude that the Division's position was substantially justified under the standard articulated in *Pierce v. Underwood,* —— U.S. ——, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988).

## III

■ We begin with a brief overview of leverage and futures contracts. A futures contract is a contract for the sale of a commodity for future delivery.

> Among the distinguishing characteristics of a futures contract is its standardized form as to quantity and other terms. The standardization, set by the designated contract market, facilitates trading of the contracts. Although many of the traders never intend to take delivery of the underlying commodity, the contracts provide for uniform delivery points and delivery dates. Trading must take place on a licensed exchange designated by the CFTC as a "contract market" and prices are established by the competitive trading on the exchange.

*Breyer v. First Nat'l Monetary Corp.,* 548 F.Supp. 955, 963 (D.N.J.1982).

Section 19 of the CEA defines a leverage contract as

---

**1.** *Riddle v. Secretary of Health & Human Services* has since been vacated and rehearing *en banc*

is pending. 823 F.2d 164 (6th Cir.1987).

a standardized contract commonly known to the trade as a margin account, margin contract, leverage account, or leverage contract, or ... any contract, account, arrangement, scheme, or device that the Commission determines serves the same function or functions as such a standardized contract, or is marketed or managed in substantially the same manner as such a standardized contract.

7 U.S.C. § 23(a).

The Senate Report accompanying the 1978 amendments to the CEA described leverage contracts as follows:

> Generally, the leverage contract currently in use is an agreement for the purchase or sale of a contract for the delivery at a later date of a specified commodity in a standard unit and quality, or the close-out of the contract by an offsetting transaction. The principal characteristics of the contract include: 1) standard units, quality, and terms and conditions; 2) payment and maintenance of "margin"; 3) close-out by an offsetting transaction or by delivery, after payment in full; and 4) no right or interest in a specific lot of the commodity. The leverage dealer is the principal to every transaction and functions as a market maker. The leverage dealer, however, does not guarantee a repurchase market and further reserves the right to cease operating as a market maker or broker for the customer. Most customer commitments are covered or "hedged" in futures, forwards, or physical inventory; most physical inventory, however, is encumbered through bank loans. Leverage contract bid/ask prices are determined by dealer adjustments to spot and futures market quotations.

S.Rep. No. 850, 95th Cong., 2d Sess. 26, *reprinted in* 1978 U.S.Code Cong. & Admin.News 2087, 2114. *See also Breyer*, 548 F.Supp. at 964–65 (discussing the 1976 Report of the Advisory Committee on Market Instruments to the Commodity Futures Trading Commission).

As the *Breyer* court noted, a section 19 leverage contract "looks strikingly like a futures contract traded off a designated contract market." *Breyer*, 548 F.Supp. at 963. The similarity between the two has made it difficult to determine the difference between a futures contract and a leverage contract "from both an economics and a legal point of view...." *First Nat'l Monetary Corp.*, 677 F.2d at 526. *See also Galvin v. First Nat'l Monetary Corp.*, 624 F.Supp. 154, 156 (E.D.N.Y.1985) ("The problem of differentiating between a futures contract and a leverage agreement has plagued both Congress and the CFTC for years."). It appears that the distinction between a leverage contract and a futures contract "hinges, in large part, upon trade usage." *Galvin*, 624 F.Supp. at 156.

Because of this confusion, Congress empowered the Commission pursuant to 7 U.S.C. § 23(c) to promulgate regulations in order to determine "whether a leverage transaction is really a different type of contract, or merely a species of futures contracts." *Breyer*, 548 F.Supp. at 964. In 1984, the Commission issued comprehensive regulations to govern leverage transactions. 17 C.F.R. §§ 31.1–31.26. These regulations set forth a narrow definition of a leverage contract. *Id.* at § 31.4(w). FNMC's "cash forward" contracts would not constitute leverage contracts under these regulations because, *inter alia*, they fail to satisfy the durational requirement (ten years or longer) and do not provide for periodic and variable carrying charges or fees. However, there is no dispute that the regulations do not apply in this case, inasmuch as they were adopted after the relevant decisions in this case.

## IV

■ FNMC argues that the Division lacked substantial justification for *commencing* the enforcement action in August 1979 because, at that time, the "cash forward" contracts were considered by the trade to be leverage contracts which need not be sold on a designated contract market.

FNMC errs in focusing exclusively on whether its "cash forward" contracts were considered by the trade to be leverage contracts. Section 19(d) of the CEA, in force

at the time the Division issued its complaint, provided in essence that if the Division determined that a so-called leverage contract was really a futures contract, the transaction could be regulated as a futures contract. 7 U.S.C. § 23(d). *See* H.R.Conf. Rep. No. 964, 97th Cong., 2d Sess. 51, reprinted in 1982 U.S.Code Cong. & Admin. News 3871, 4055, 4069. Consistent with this provision, the Division's position throughout this litigation has been that FNMC's "cash forward" contracts are futures contracts being illegally sold outside a designated contract market. The issue then, at least before the Division agreed in 1982 that the "leverage defense," if proven, would be dispositive, is whether the Division was substantially justified in seeking to determine through adjudication that FNMC's "cash forward" contracts were futures contracts being illegally sold off a designated contract market.

The record in this case indicates that the Division's position was substantially justified. Consider, for example, the Division's 1978 "Survey of Leverage Trading," which reviewed, *inter alia*, a forward contract similar to that offered by FNMC. The objective of the survey was "to develop specific factual findings concerning the nature and extent of leverage and margin trading in the United States so as to enable the Commission to determine whether such transactions [were] in fact contracts for future delivery and to provide a basis for the development of appropriated regulations." After setting forth the principal characteristics of the traditional leverage contract, the study concluded that "all of these characteristics [were] not unlike those of futures transactions." The Division thus recommended that the Commission study this issue further, because there was strong indication that the leverage transactions reviewed were in fact futures contracts and therefore must be sold on a designated contract market.

Thereafter, the Commission asked its Office of Chief Economist to prepare an opinion as to whether the surveyed leverage transactions were actually futures contracts. On May 8, 1978, Blake Imel, the Acting Chief Economist, concluded that the leverage transactions were essentially futures contracts. Imel reiterated this conclusion in an October 1981 sworn statement prepared for this litigation. These and other authorities in the record support the Division's belief in August 1979 that FNMC's "cash forward" contracts were futures contracts subject to regulation.

Moreover, FNMC's "cash forward" contracts had many of the essential characteristics of futures contracts. The "cash forward" contracts provided for the delivery of a commodity in the future and were standardized as to such terms as quantity, quality, initial margin payment, method of delivery and the date on which customers were required to give notice of intent to make or take delivery. In addition, FNMC fixed the price of its cash forwards at the time the contracts were made. The "cash forward" contracts also provided the opportunity to forego delivery by means of offset or rollover, and required initial margin payments that were a percentage of the contract price. Both the ALJ and the Commission concluded that FNMC "cash forward" contracts had characteristics similar to futures contracts, and we agree with this determination.

Thus, the record indicates that the Division was substantially justified in believing that FNMC's "cash forward" contracts were futures contracts being illegally sold outside a designated contract market and, therefore, there was a need to resolve this issue through adjudication.

Next, FNMC contends that, even if there had been some justification for the enforcement action when it was commenced, the complaint should have been dismissed when it became clear in 1982 under the Division's stipulation that the "leverage defense" would be dispositive. We do not believe, however, that the validity of the "leverage defense," as a matter of fact, was settled before the adjudicatory hearing commenced, because FNMC's witnesses had not yet been examined. We agree with the Division that it should not be liable "merely because it did not make a pre-trial determination that FNMC would prevail on the leverage defense before it had an op-

portunity to probe the substance of that defense." Indeed, the Division's decision to proceed to a hearing on the merits of the defense is consistent with the position taken by two federal courts faced with the same issue. *Galvin v. First National Monetary Corp.*, 624 F.Supp. 154 (E.D.N.Y.1985); *Breyer v. First National Monetary Corp.*, 548 F.Supp. 955 (D.N.J.1982).

Since the ALJ found that FNMC failed to satisfy the "leverage defense" at the adjudicatory hearing, the Division had no reason to abandon its enforcement action following this hearing. The "leverage defense" did not truly become "dispositive" until the Commission finally ruled that the ALJ erred in rejecting the testimony of all the leverage witnesses.

FNMC contends that the Division should have concluded before the hearing, based on all the available authorities defining leverage contracts, that its "cash forward" contracts were leverage contracts. However, it is not altogether clear that the "cash forward" contracts were commonly known to the trade as leverage contracts. FNMC's "cash forward" contracts are of short duration (maximum of 15 months), yet "[s]everal commentators have referred to leverage contracts as long term agreements generally of 5–10 years duration." *Breyer*, 548 F.Supp. at 965 n. 25 (citing A. Pierno, *The Leverage Contract Ruling: Is Jonah Really Gone?*, 35 Bus.Lawyer 863 (March 1980); and P. Johnson, *Commodities Regulation*, § 1.08 at 23 (1982)).[2] Moreover, the Commission believed there were grounds for disbelieving or disregarding the testimony of several FNMC trade witnesses, suggesting that the Division was justified in exploring the credibility and expertise of these witnesses. *See Galvin*, 624 F.Supp. at 157 ("I find that there are material issues of fact which must be resolved at trial, not the least of which is the credibility of the affiants.").

FNMC argues that the "leverage defense" was really never at issue because the Division failed to present evidence rebutting the defense. However, the Division pursued an acceptable trial tactic—relying on cross-examination of FNMC's witnesses—in an effort to establish its case. This tactic is particularly appropriate where the Division is seeking to disprove a defense. That the tactic proved to be less than successful in hindsight does not compel the conclusion that it was an unjustified means of defending against the "leverage defense." Nor does it mean that the Division was not sustantially justified in using the adjudicatory hearing to discredit the evidence in support of the defense.

Finally, FNMC argues that the Division's successful efforts in blocking FNMC's attempts to subpoena current and former Commission employees demonstrates a lack of substantial justification for the litigation. We find nothing suspect about the Division's legally authorized actions, which were designed to protect other interests in the course of these proceedings. Moreover, the record does not support FNMC's contention that these potential witnesses would have testified in support of the "leverage defense."

In short, the Division was substantially justified in testing the efficacy of the "leverage defense" in the adjudicatory proceeding. The Commission's order denying fees and expenses under the EAJA is supported by substantial evidence.

Having reviewed the remaining contentions and finding them to be without merit, we AFFIRM the Commission's order.

---

**2.** The *Breyer* court believed the difference between the length of FNMC's "cash forward" contracts and typical leverage contracts was "insignificant," but did not deny the existence of the controversy. 548 F.Supp. at 965. This reinforces the Division's contention that there was no universal trade definition of a leverage contract.