COMMODITY FUTURES TRADING COMMISSION, Plaintiff,

v.

AMERICAN PRECIOUS METALS, LLC, Harry Robert Tanner, Jr., and Sammy J. Goldman, Defendants.

Case No. 11–61075–CIV.

United States District Court, S.D. Florida.

Sept. 30, 2011.

Carlin R. Metzger, Jennifer E. Smiley, Joseph A. Konizeski, Rosemary Hollinger, Stephanie Reinhart, U.S. Commodity Futures Trading Commission, Chicago, IL, for Plaintiff.

Lawrence Brett Lambert, Law Office of Lawrence B. Lambert, Miami, FL, Marc Aaron Wites, Jonathan Stephen Burns, Wites & Kapetan, Lighthouse Point, FL, for Defendants.

### FINAL ORDER OF DISMISSAL

WILLIAM J. ZLOCH, District Judge.

THIS MATTER is before the Court upon Defendants' Memorandum Of Law In Opposition To Plaintiff's Motion For Preliminary Injunction (DE 20), which the Court construes as a Motion To Dismiss pursuant to Fed.R.Civ.P. 12(b)(6), oral argument at the preliminary injunction hearing held on May 24, 2011, and the supple-

mental briefing filed by the Parties. *See* DE Nos. 40, 45, & 46. The Court has carefully reviewed said Motion and briefing, the entire court file and is otherwise fully advised in the premises.

Plaintiff Commodity Futures Trading Commission (hereinafter "the CFTC") initiated the above-styled cause with the filing of a two-count Complaint (DE 1), alleging in Count I that Defendants violated Section 19 of the Commodities Exchange Act (hereinafter "the CEA"), 7 U.S.C. § 23, and Rule 31.3 thereunder, 17 C.F.R. § 31.3, by making fraudulent misrepresentations to customers while marketing precious metals. In Count II, the CFTC alleges that Defendants violated Section 19(b) of the CEA, 7 U.S.C. § 23(b), by engaging in transactions involving palladium. By its Complaint (DE 1), the CFTC has properly raised a federal question and thus this Court has subject matter jurisdiction over this cause pursuant to 28 U.S.C. § 1331. However, the Parties dispute whether the CFTC has regulatory jurisdiction under Section 19 of the CEA.

On May 24, 2011, the Court held a preliminary injunction hearing regarding the CFTC's Motion For Preliminary Injunction (DE 6). At that hearing, the Court informed the Parties that it was treating the Defendants' Memorandum Of Law In Opposition To Plaintiff's Motion For Preliminary Injunction (DE 20) as a Motion To Dismiss because Defendants alleged therein that the contracts at issue do not fall within the CFTC's regulatory jurisdiction under Section 19. The Court also informed the Parties that it would be denying that Motion (DE 20), and would enter an order setting forth its reasons later.

For the reasons expressed herein, the Court will vacate its prior *ore tenus* ruling denying Defendants' Motion To Dismiss (DE 20), and will grant Defendants' Motion To Dismiss (DE 20).

## I. Background

The following facts are taken from the Complaint (DE 1) and the CFTC's Motion For Preliminary Injunction (DE 6). Defendant American Precious Metals, LLC (hereinafter "APM") is a telemarketing firm purporting to sell physical gold, silver, platinum and palladium to customers through what it describes as its "leverage program." Since at least July of 2007, APM has allegedly elicited more than $37 million from its customers. Defendant Harry Robert Tanner, Jr. is the Managing Member of APM, and together with Defendant Sammy J. Goldman, controls the daily operations of the firm.

Acting at the direction of Defendants Tanner and Goldman, APM's agents and employees solicited customers through telephone, mail, and APM's web-sites. These APM representatives told customers that:

(1) APM sells physical precious metals to customers on a leveraged basis; (2) APM arranges for a loan to the customer through a second company named Global Asset Management (hereinafter "GAM"), which purportedly lends up to 80% of the funds for the purchase of physical precious metals; (3) customers' physical precious metals are stored in an independent depository; and (4) interest accrues on funds lent to the customer by GAM.

DE 1, ¶ 2.

However, the CFTC alleges that:

In fact, APM [did] not buy, sell, or store physical precious metals ... and no actual financing [was] ever provided. Instead, APM record[ed] each customer's transaction on paper, [took] a hefty commission of 40% of the customer's funds, [pooled] the customer's remaining funds

together with funds received from its other customers, and periodically [sent] those pooled funds to GAM. In turn, GAM pooled the funds received from APM with funds received from similar boiler rooms, and [sent] a portion of those funds to accounts in GAM's name with three London-based firms, where it [held] positions on margin in off-exchange metals derivatives. In the meantime, APM actively conceal[ed] its fraud, in part by creating and sending customers false trade confirmation statements that reflect[ed] the purchase of actual, physical precious metals.

DE 6, p. 6.

APM customers signed agreements with GAM to supposedly invest in precious metals. The GAM agreements provided for initial five year terms, followed by automatic renewals of successive five year terms. *See* DE 6–14, p. 35; DE 24–2, p. 37.

By this conduct, the CFTC alleges, *inter alia*, that Defendants committed fraud in violation of Section 19 of the CEA, 7 U.S.C. § 23, and Rule 31.3 thereunder, 17 C.F.R. § 31.3. In their Motion To Dismiss (DE 20) and their Supplemental Brief (DE 40), Defendants argue that the transactions at issue do not fall within the CFTC's regulatory jurisdiction under Section 19 because they last fewer than ten years, and therefore are not "leverage contracts" as defined by the CFTC's Rule 31.4z(w), 17 C.F.R. § 31.4(w). In response, the CFTC argues, *inter alia*, that Rule 31.4(w) only applies to a subset of a broader class of "Section 19 transactions." *See* DE 45. Thus, the CFTC asserts that it still has jurisdiction over contracts it determines are the functional equivalent of leverage contracts, as well as contracts it determines are marketed or managed in substantially the same manner as leverage contracts. *Id.*

## II. Analysis

### A. *Chevron* Deference

When an agency construes a jurisdictional provision of a statute it is responsible for administering, courts have regularly resolved the dispute by applying the framework established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See, e.g., Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*, 557 U.S. 261, 129 S.Ct. 2458, 2469, 174 L.Ed.2d 193 (2009); *see also Cavert Acquisition Co. v. NLRB*, 83 F.3d 598 (3d Cir. 1996) (implicitly applying *Chevron*); *but see Northern Steel Supply Co. v. Sec'y of Labor*, 294 F.3d 844 (7th Cir.2002) (declining to apply *Chevron*). In *Chevron*, the Supreme Court held that, "[t]he power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Chevron, supra*, at 843, 104 S.Ct. 2778 (additional citation omitted). Thus, *Chevron* established a principle of judicial deference to an agency's construction of a statute it is responsible for administering. As the Supreme Court has held, "*Chevron's* premise is that it is for agencies, not courts, to fill statutory gaps." *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Svcs.*, 545 U.S. 967, 982, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). *Chevron* applies to the instant case because the CFTC is construing a jurisdictional provision of the CEA—a statute it is responsible for administering. *See Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) (noting that Congress has charged the CFTC with administration of the CEA). The Court thus turns to examine whether judicial deference to the CFTC's construction of the CEA is warranted here.

The *Chevron* Court established a two-part inquiry for determining whether judicial deference to an agency's statutory construction is warranted. First, the district court must determine whether Congress left a statutory "gap" for an agency to fill via administrative rule-making. A statutory gap exists where Congress has not "directly spoken to the precise question" at issue, *see Coeur Alaska, supra,* at 2469 (internal quotation omitted), meaning that the statute at issue is silent or ambiguous as to a particular matter.

Here, the language of Section 19 of the CEA demonstrates that Congress did not directly speak to the precise question of how a "standardized contract" is defined.[1] Section 19(a) provides that:

> Except as authorized under subsection (b) of this section, no person shall offer to enter into, enter into, or confirm the execution of, any transaction for the delivery of any commodity under a standardized contract commonly known to the trade as a margin account, margin contract, leverage account, or leverage contract, or under any contract, account, arrangement, scheme, or device that the Commission determines serves the same function or functions as such a standardized contract, or is marketed or managed in substantially the same manner as such a standardized contract.

7 U.S.C. § 23(a). In turn, Section 19(b) states:

> Subject to paragraph (2), no person shall offer to enter into, enter into, or confirm the execution of, any transaction for the delivery of silver bullion, gold bullion, bulk silver coins, bulk gold coins, or platinum under a standardized contract described in subsection (a) of this section, contrary to the terms of any rule, regulation, or order that the Commission shall prescribe, which may include terms designed to ensure the financial solvency of the transaction or prevent manipulation or fraud.

7 U.S.C. § 23(b)(1). Thus, Congress left a gap—or ambiguity—for the CFTC to fill in the exercise of its own discretion.

Under *Chevron*'s second prong, courts must resolve a statutory ambiguity by "look[ing] first to the agency regulations, which are entitled to deference if they resolve the ambiguity in a reasonable manner." *Coeur Alaska, supra.* Here, the Court must examine whether the CFTC has reasonably resolved the ambiguity Congress created by not defining the term "standardized contract" in Section 19. To do so, the Court looks first to the relevant agency regulation, Rule 31.4(w).

### B. Rule 31.4(w)

Congress's decision not to define the term "standardized contract," (more commonly known as a "leverage contract" or "leverage agreement") in Section 19 of the CEA caused confusion in the financial industry. *See, e.g., First Nat'l Monetary Corp. v. Commodity Futures Trading Comm'n,* 860 F.2d 654, 658 (6th Cir.1988) ("The problem of differentiating between a futures contract and a leverage agreement has plagued both Congress and the CFTC for years.") (internal citation omitted). The problem was that "a section 19 leverage contract 'look[ed] strikingly like a futures contract traded off a designated contract market'." *Id.*

To clear up this confusion, Congress passed legislation in 1982 requiring the CFTC to regulate leverage contracts "as an entirely separate class of transactions." *Purdy v. Commodity Futures Trading*

---

1. The CFTC's Section 19 jurisdiction flows from Section 2 of the CEA, which grants the CFTC exclusive jurisdiction over "transactions subject to regulation by the Commission pursuant to section 23 of this title." 7 U.S.C. § 2(a)(1)(A).

*Comm'n,* 968 F.2d 510, 514–515 (5th Cir. 1992) (*citing* the Futures Trading Act of 1982, *Pub.L. No. 97–444, § 234, 96 Stat. 2294 (codified as amended at 7 U.S.C.A. § 23 (West Supp 1992)))*. What Congress wanted to know was "whether a leverage transaction is really a different type of contract, or merely a species of futures contracts." *First Nat'l Monetary Corp., supra.*

In 1984, the CFTC responded by promulgating, among others, Rule 31.4(w) which defined the term "leverage contract" as a contract lasting ten years or more, in addition to other criteria. Rule 31.4(w) states:

> *Leverage contract means a contract, standardized as to terms and conditions, for the long-term (ten years or longer) purchase ("long leverage contract") or sale* ("short leverage contract") by a leverage customer of a leverage commodity which provides for: (1) Participation by the leverage transaction merchant as a principal in each leverage transaction; (2) Initial and maintenance margin payments by the leverage customer; (3) Periodic payment by the leverage customer of … [a] charge or fees …; (4) Delivery of a commodity in an amount and form which can be readily purchased and sold in normal commercial or retail channels; (5) Delivery of the leverage commodity after satisfaction of the balance due on the contract; and (6) Determination of the contract purchase and repurchase, or sale and resale prices by the leverage transaction merchant.

17 C.F.R. § 31.4(w) (emphasis added).[2] Any contract lasting fewer than ten years was therefore not a leverage contract under Rule 31.4(w). *See, e.g., First National Monetary Corp., supra* (holding that the ten year threshold in Rule 31.4(w) was in fact a "durational requirement"); *accord Commodity Futures Trading Comm'n v. P.I.E., Inc.,* 853 F.2d 721 (9th Cir.1988); *Galvin v. First Nat. Monetary Corp.,* 624 F.Supp. 154, 156 (E.D.N.Y.1985). In the instant case, the Parties do not dispute the fact that Defendants' transactions lasted for terms of only five years and thus are not leverage contracts. *See* DE 45, p. 1; DE 23, p. 4.

Instead, the Parties' central dispute in this litigation is whether Rule 31.4(w) limited the CFTC's Section 19 jurisdiction to leverage contracts alone. If it did, then the CFTC would lack regulatory jurisdiction over Defendants' contracts under Section 19, and this matter would have to be dismissed.

Under the *Chevron* framework, the Court must resolve this dispute by looking first to Rule 31.4(w) to determine whether it reasonably resolves the ambiguity in question. *See Coeur Alaska, Inc.,* 129 S.Ct. at 2469. The text of Rule 31.4(w) clearly does not .address the question at issuer whether the scope of the CFTC's Section 19 jurisdiction is broader than leverage contracts alone. Instead, the text merely defines the term "leverage contract," without any indication that this definition constitutes the entirety of the CFTC's Section 19 jurisdiction. Reading the Rule's text alone, therefore, it is plausible to conclude that the CFTC's Section 19 jurisdiction extends more broadly. For instance, the CFTC argues that Rule 31.4(w) leverage contracts were just one subset of a broader class of Section 19 "standardized transactions." Further, the CFTC asserts that Rule 31.4(w) did nothing to truncate its Section 19 jurisdiction over transactions that are the "functional equivalent" of leverage contracts, or over transactions that are "marketed or man-

---

**2.** This rule was promulgated pursuant to notice-and-comment rule-making.

aged in substantially the same manner as" leverage contracts. *See* 7 U.S.C. § 23(a).

■ Since Rule 31.4(w)'s text is ambiguous, the Court must resolve the ambiguity by looking to the agency's interpretation of the Rule. *See Coeur Alaska, Inc.,* 129 S.Ct. at 2469. Under the Supreme Court's opinion in *Auer v. Robbins,* 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997), "[w]here the rule to be interpreted is a creature of the Secretary's own regulations ... [his] interpretation of it is, under [Supreme Court] jurisprudence, controlling unless plainly erroneous or inconsistent with the regulation." *Fast v. Applebee's Int'l, Inc.,* 638 F.3d 872, 878 (8th Cir.2011) (*quoting Auer,* supra). *Auer* must also be read in light of the Supreme Court's more recent opinion in *Coeur Alaska.* In *Coeur Alaska,* the Supreme Court held that an agency memorandum construing an ambiguous regulation was entitled to *Auer* deference because it "interpret[ed]" the agencies' own regulatory scheme." 129 S.Ct. at 2473.

Here, because Rule 31.4(w) was promulgated pursuant to notice-and-comment rulemaking procedures, the CFTC's interpretation of it is entitled to deference under *Auer* unless that interpretation is plainly erroneous or inconsistent with the Rule, and under *Coeur Alaska* if it interprets the CFTC's own regulatory scheme. The Court now turns to examine three sources in which the CFTC has interpreted Rule 31.4(w).

### C. CFTC Interpretations of Rule 31.4(w)

Defendants point to three sources wherein the CFTC has interpreted Rule 31.4(w) as limiting its Section 19 jurisdiction to leverage contracts alone. First, the preamble to the interim final version of Rule 31.4(w) clearly stated that "leverage contracts" and "standardized contracts" are one and the same:

Through its definition ... of a leverage contract, the Commission is exercising its exclusive regulatory jurisdiction over transactions that fall within the scope of Section 19 of the Act. In adopting that definition, the Commission has exercised its authority to specify the standardized contracts that Congress expected to be regulated under Section 19 of the Act. *As a result ... those transactions that do not meet the Commission's definition of a leverage contract are not within the Commission's regulatory jurisdiction under Section 19 of the Act and are not subject to Commission registration and regulation pursuant to Part 31.* This "bright line" distinction between transactions subject to exclusive Commission jurisdiction under Section 19 and those not subject to Commission regulation thereunder is one of the salutary effects of the comprehensive definition adopted by the Commission. Those transactions not subject to exclusive Commission jurisdiction under Section 19 are open to regulation and enforcement by the states.

Fed.Reg. 5498–01, 5499–5500 (1984) (emphasis added). Thus, at the time Rule 31.4(w) was taking effect, the CFTC's position was that its Section 19 jurisdiction only included leverage contracts.

Second, Defendants point to a statutory and regulatory interpretation letter issued by CFTC General Counsel Kenneth M. Raisler on March 25, 1985, less than a year after Rule 31.4(w) took effect (hereinafter "the letter" or "the General Counsel's letter"). Quoting the preamble to the interim final rule, the letter confirmed that: "[T]ransactions that do not meet the Commission's leverage contract definition in Rule 31.4(w) are not subject to regulation under Section 19." However, the letter explained that such transactions may still

be subject to CFTC jurisdiction under Section 4(a) of the CEA:

> While the terms and conditions of any particular transaction must be examined on a case-by-case basis, the Commission's Office of General Counsel is of the view that many off-exchange future delivery type transactions, whether or not 'masquerading' as leverage contracts, are in fact commodity futures contracts and are per se unlawful under section 4(a) of the Commodity Exchange Act.

50 Fed.Reg. 11656–01. Thus, the General Counsel's letter confirmed that Rule 31.4(w) did in fact limit the CFTC's Section 19 jurisdiction to leverage contracts alone. In addition, it explained how Rule 31.4(w) and Section 19 fit into the larger statutory framework of the CEA. Under that framework, the CFTC could regulate leverage contracts under Section 19, and futures contracts under Section 4. Transactions that looked like leverage contracts but did not meet Rule 31.4(w)'s criteria could still be regulated under Section 4, on a case-by-base basis.

Third, Defendants highlight Interpretive Letter 85–2, issued by the CFTC on August 6, 1985, entitled *Bank Activities Involving the Sale of Precious Metals., 22,673, Commodity Futures Trading Commission. See* DE 40–2. In Interpretive Letter 85–2, the CFTC fielded a request for an interpretation of the applicability of the CEA to certain precious metals transactions. The Letter is significant because it concluded that the transactions at issue were "not leverage contracts within the meaning of Commission Rule 31.4(w) and . . . thus not subject to Commission regulation as such." *Id.* at p. 3. Thus, the agency once again interpreted Rule 31.4(w)'s leverage contract definition as clearly demarcating its Section 19 jurisdictional boundaries.

The Court finds that these three interpretations of Rule 31.4(w) are entitled to judicial deference for two reasons. First, they are not plainly erroneous or inconsistent with the Rule. *See Auer, supra.* On the contrary, they are perfectly consistent with Congress's intent that the CFTC distinguish between leverage contracts and futures contracts by regulating leverage contracts "as an entirely separate class of transactions." *Purdy v. Commodity Futures Trading Comm'n,* 968 F.2d 510, 514–515 (5th Cir.1992) (*citing* the Futures Trading Act of 1982, *Pub.L. No. 97–444, § 234, 96 Stat. 2294 (codified as amended at 7 U.S.C.A. § 23 (West Supp.1992))*); *see also First Nat'l Monetary Corp.,* 860 F.2d at 658. Second, the preamble to the interim final rule and the General Counsel's letter both "interpret the agency's regulatory scheme" by explaining how Rule 31.4(w) and Section 19 fit into the CEA's statutory framework. *Coeur Alaska, supra.* Under *Coeur Alaska,* this fact "entitl[es] [them] to a measure of deference." *Id.; accord Sottera, Inc. v. Food & Drug Administration,* 627 F.3d 891, 903 at fn. 4 (D.C.Cir.2011).

Nevertheless, the CFTC objects that these sources represent a narrow jurisdictional view that the agency no longer holds. Instead, it urges the Court to adopt the broader jurisdictional view the agency advances in this litigation.

When an agency has adopted conflicting interpretations of its own regulation, as the CFTC has done here, the Court must determine which interpretation is entitled to deference. "It is well-established that courts must defer to an agency's consistent interpretation of its own regulation unless it is plainly erroneous or inconsistent with the regulation." *Bradberry v. Dir., Office of Worker's Comp. Programs,* 117 F.3d 1361, 1366 (11th Cir. 1997) (citation omitted); *see also Vidiksis*

*v. EPA,* 612 F.3d 1150, 1154 (11th Cir. 2010); *Norfolk S. Ry. v. Shanklin,* 529 U.S. 344, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000). "Such deference is due particularly when the agency has made a written interpretation of the regulation or has maintained a longstanding policy on the subject. However, we need not defer to a mere litigating position." *Bradberry, supra.* It is true that a position advanced by counsel in a legal brief may be entitled to deference if that position represents the agency's "fair and considered judgment" on the matter in question. *See Auer, supra,* at 462, 117 S.Ct. 905 (*citing Bowen v. Georgetown Univ. Hospital,* 488 U.S. 204, 212, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988)). However, "[d]eference to what appears to be nothing more than the agency's convenient litigating position would be entirely inappropriate." *Bowen, supra,* at 213, 109 S.Ct. 468,

■ Here, the CFTC has not demonstrated that it has consistently interpreted Section 19 in the broad manner it now advances in this action. *See Bradberry, supra.* Moreover, the CFTC's current position is not a written interpretation. *See id.* While the CFTC's current position may not be a mere litigating position, there is no evidence that it embodies the agency's "longstanding policy" on the subject. *Id.* For all these reasons, the Court finds that the CFTC's current position is not entitled to deference.

■ Instead, the Court will defer to the CFTC's prior position embodied in the interim final version of Rule 31.4(w), the General Counsel's letter, and Interpretive Letter 85–2. Accordingly, the Court finds that the CFTC's regulatory jurisdiction under Section 19 of the CEA only extends to leverage contracts as defined in Rule 31.4(w). Thus, in the instant case, the CFTC lacks Section 19 regulatory jurisdiction because Defendants' transactions are not leverage contracts under Rule 31.4(w). Therefore, the Court must dismiss the Complaint (DE 1).

In making this finding, the Court notes that several federal courts have reached the same conclusion. *See Commodity Futures Trading Comm'n v. P.I.E., Inc.,* 853 F.2d 721 (9th Cir.1988) (holding that Rule 31.4(w) drew a "bright line" between leverage contracts and future contracts, and no third category or Section 19 transactions exists); *accord In re Bybee,* 945 F.2d 309 (9th Cir.1991); *Commodity Futures Trading Comm'n v. 20/20 Trading Co., et al.,* 2011 WL 2221177 (C.D.Cal. June 7, 2011) (holding that "leverage contracts" are the sole type of transaction over which the CFTC has jurisdiction under Section 19). By contrast, the CFTC has proven unable to cite a single case in which a court has adopted the broad view of Section 19 espoused by the agency in this litigation.

In addition, the CFTC has cited no precedent for its assertion of Section 19 jurisdiction in Count II of the Complaint (DE 1) over Defendants' palladium transactions. *See* DE 45, p. 2. Thus, the Court finds that the CFTC has not met its burden of establishing that these transactions fall under the CFTC's Section 19 jurisdiction. *See 20/20 Trading, supra,* at *7, fn. 4 (finding that the CFTC lacked jurisdiction under Section 19 over the defendants' palladium transactions because they were not leverage contracts). Thus, the Court will also dismiss Count II of the Complaint.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. The Court's prior *ore tenus* ruling denying Defendants' Motion To Dismiss (DE 20), be and the same is hereby **VACATED;**

2. Defendants' Motion To Dismiss (DE 20) be and the same is hereby **GRANTED;**

3. Plaintiff's Complaint (DE 1) be and the same is hereby **DISMISSED;** and

4. To the extent not otherwise disposed of herein, all pending motions are hereby **DENIED** as moot.